Everett AKERS et al., Plaintiffs,

v.

Charlotte BALDWIN et al., Defendants,

and

Falcon Coal Company et al.,
Intervening Complainants.

Matthew BAKER et al., Appellants,

v.

Elizabeth WOOTEN et al., Appellees.

Nos. 85–SC–392–CL, 85–SC–422–TG.

Supreme Court of Kentucky.

July 2, 1987.

As Corrected July 2, 1987.

As Modified on Denial of Rehearing
Sept. 24, 1987.

Joe F. Childers, Shepherd & Childers, Lexington, Thomas J. Fitzgerald, Frankfort, David Rubinstein, Prestonsburg, for plaintiffs.

Iris S. Nickell, David J. Obradovich, Mary Katherine Daugherty, Frankfort, for defendants.

John A. Bartlett, Winfrey P. Blackburn, Jr., Stites & Harbison, Louisville, Leon Hollon, Paul R. Collins, Hazard, for appellants.

Joe F. Childers, Shepherd & Childers, Lexington, for appellees.

John S. Palmore, Lexington, Richard W. Iler, Louisville, Richard C. Ward, Lexington, Joseph J. Zaluski, Frankfort, for intervening complainants.

Sidney B. Douglass, Harlan, for amicus curiae: Kentucky Fair Tax Coalition, Inc. & Concerned Citizens of Martin County, Inc.

STEPHENS, Chief Justice.

On this appeal we again consider the legal effect of the so-called "broad form deeds" on the conflicting rights of the owners of the surface to land and the owners of the mineral rights under that land.[1]

Specifically, we reexamine the doctrine set forth in the seminal case of *Buchanan v. Watson*,[2] which allows mineral owners to strip mine[3] with little or no restriction or liability to the owner of the surface, even to the extent of absolute obliteration of the surface and all its appurtenances. We also address the constitutionality of KRS 381.-930 to 381.945 (1984), the ultimate purpose of which is to prohibit strip mining under the provisions of broad form deeds.

## PROCEDURAL AND FACTUAL BACKGROUND

Appellants Akers and others filed suit in the United States District Court for the Eastern District of Kentucky against Charlotte Baldwin, Secretary, Natural Resources and Environmental Protection Cabinet, Commonwealth of Kentucky. An injunction was sought to prevent Baldwin from issuing strip mining permits where the right to strip mine was claimed under an instrument which severed the minerals and the surface, and where said instrument did not specifically give the mineral owner the right to mine in such manner, and where the surface owner objected to, or did not consent to, such method of mining.[4] The District Court entered a preliminary injunction, partially granting the relief sought. Falcon Coal Company and others filed an intervening complaint, challenging the applicability and constitutionality of KRS 381.930–945 (1984) and claiming that such dispute between the mineral owner and the surface owner does not constitute a legal basis for withholding a strip mining permit. The District Court, pursuant to CR 76.37, requested this Court to certify the constitutional challenge to KRS 381.930 *et seq.* We granted this request.

In the second case, *Baker v. Wooten,* appellant Baker, plaintiff below, is the lessee of the mineral rights of a 427 acre tract of land in Perry County. Appellees Elizabeth Wooten and her children and their spouses are the owners of the surface rights to a portion of that land. Baker's lessors trace their title to the coal and other minerals to a 1910 deed which severed the mineral estate from the surface estate. Baker was engaged in strip mining, with a valid permit, on land adjacent to the property owned by appellees. Appellees denied Baker permission to enter on the surface of their property to do geological work prior to beginning strip mining operations thereon.

Baker filed an action in the Perry Circuit Court, seeking a declaration of rights and injunctive relief which would enable him to strip mine on the Wooten property. When the lawsuit was filed there was no legislation in Kentucky which specifically addressed the construction and interpretation of mineral severance deeds. Baker moved for a summary judgment, claiming that

---

1. A description of this type deed appears later.

2. Ky., 290 S.W.2d 40 (1956) (hereinafter referred to as *Buchanan*).

3. For the purposes of this opinion, the phrase "strip mine" will encompass all types of mining wherein the surface of the earth is removed, by any of several methods, to enable the removal of the minerals lying thereunder. Other general terms, such as "surface mining", "auger mining", etc., may be used interchangeably.

4. The premise of this lawsuit is the claim that the Federal Surface Mining Control and Reclamation Act of 1977 (P.L. 95–87) (30 U.S.C. 1201 et seq.) forbids the issuance of such a permit until any dispute has been decided by a state court. See 30 U.S.C. 1257(b)(9).

existing Kentucky common law gave him the absolute right to strip mine. The Wootens filed a cross-claim and a motion for summary judgment, claiming that KRS 381.930–945[5] prevented their property from being strip mined. The trial court declared the statute to be constitutional and, following an evidentiary hearing, determined that when the 1910 severance deed was recorded there was no strip mining in the vicinity. Therefore, the trial court reasoned, under the terms of the statutes the owner of the mineral rights or his successor (Baker) could not strip mine on the Wooten property. A notice of appeal was filed by Baker in the Kentucky Court of Appeals. Following this, the appellees filed a motion requesting this Court to transfer the appeal.

We granted the motion and, *sua sponte,* consolidated the two cases. We also directed that, in addition to the questions presented in the certification request and in the *Baker* appeal, the parties should address whether a standard broad form deed gives the owner of the mineral rights the right to extract coal by surface mining, as held in *Buchanan.*

## CONTENTIONS OF THE PARTIES

Not surprisingly, Falcon Coal Company and other coal companies, as intervenors in *Akers v. Baldwin,* joined with the appellant in the case of *Baker v. Wooten* in urging that KRS 381.930–945 are unconstitutional and that *Buchanan* is correct and should not be overruled or disturbed. Equally predictably, Baldwin and Akers joined with Wooten in advocating the constitutionality of the questioned statutes and in urging the overturn of *Buchanan* and its progeny.

In this opinion we will first consider the issues relative to the respective and often conflicting rights of the owners of the surface of the land and the owners of the minerals that lie under that surface. In so

doing, we will perforce reconsider our decision in *Buchanan.* Secondly, we will examine the constitutionality of the Kentucky General Assembly's attempt to deal with the same issue in the instance of broad form deeds.

■ The genesis of the conflict between the owner of the surface and the owner of the minerals thereunder is the well-established legal doctrine that surface rights and mineral rights can be separate and distinct legal estates in land. The minerals are legally distinct from the surface under which they lie. Such mineral estates are said to be "severed" from the surface. *Duncan v. Mason,* 239 Ky. 570, 39 S.W.2d 1006 (1931); see 4 D. Vish, *Coal Law and Regulation,* Section 80.01 (1983) (hereinafter cited as Vish).

■ The severance of the minerals and the surface can be achieved by a lease of the mineral rights or by a deed which creates a fee simple title to the minerals. Such separate estate can also be created by the sale of the surface, with a reservation of the minerals by the grantor.[6] Vish, Section 80.02.

■ In spite of the theoretical purity of the doctrine of severability,[7] the two estates are inextricably intermingled. The surface covers the mineral estate, and as a result, there is inherent in the mineral estate a right of access in and through the surface to the minerals. Of what value is a mineral if it cannot be mined? The surface owner has no right in the minerals; the mineral estate is therefore considered to be the dominant estate, and the surface estate is the servient one. E.g., *McIntire v. Marian Coal Co.,* 190 Ky. 342, 227 S.W. 298, 299 (1921).

The conflicting rights of the surface owner and the mineral owner have led to a plethora of litigation, not only in Kentucky

---

5. KRS 381.930–945 was enacted during the litigation before the Perry Circuit Court.

6. To show the vitality of the doctrine of severability, we note that adverse possession of the surface does not extend to the minerals thereun-

der. *Brockman v. Jones,* Ky.App., 610 S.W.2d 943 (1980); see KRS 381.430 (1972).

7. The doctrine of severability exists in all jurisdictions except Louisiana, 4 D. Vish, Coal Law and Regulation, § 80.01[1] (1983).

but throughout the United States.[8] In Kentucky, the problem has been exacerbated by the advent of strip mining and this Court's attitude toward the conflicting rights under so-called "broad form deeds".

■ The somewhat apocryphal term "broad form deed" is loosely defined as a conveyance which severs the mineral estate from the surface estate and which has a long and tedious description of granted rights as opposed to those mineral deeds which grant only necessary and convenient mining rights, or no mining rights at all. It is a particular, if not unique, form of deed which normally conveys all of the minerals under the surface. It may, however, list only certain specific substances. Additionally, such a deed conveys—specifically to the grantee—surface rights the grantee deems necessary or convenient for the full and free exercise and enjoyment of the minerals conveyed. Some deeds, if not most, contain an express waiver of liability for damages arising from the grantee's use of the surface in obtaining the minerals. Lastly, most such deeds reserve to the grantor only such surface rights as may be consistent with the mineral rights conveyed.[9] It has been left to the Kentucky Court of last resort to interpret those deeds and to identify the rights of the surface owner as opposed to those of the mineral owner.

## KENTUCKY CASES PRIOR TO BUCHANAN V. WATSON

In the early part of this century, we declared that a conveyance in a deed of "all the minerals" included any and all diamonds found thereon. *Kentucky Diamond Mining and Developing Co. v. Kentucky Transvaal Diamond Co.*, 141 Ky. 97, 132 S.W. 397 (1910). We said,

"When the language of the deed is broad enough to cover everything that may be found on the land, it is not material to the effect of the deed that the parties in fact contemplated at the time that a particular thing might be found on the land.... *A deed is to be construed against the grantor, rather than against the grantee because the grantor selects his own words....*" *Id.*, at 398, 399 (emphasis added).

Parol evidence that would limit the scope of the grant, if not excluded, was ignored and the broad conveyance of "all the minerals" was given literal effect. The doctrine that a deed is to be strictly construed against the grantor, thus stated, has remained unchanged in our case law.

In the case of *Scott v. Laws*, 185 Ky. 440, 215 S.W. 81 (1919), we reaffirmed the principle that permitted the legal severance of the surface and the minerals thereunder. We further held that the ownership and right to mine those minerals was not lost by forty years of non-use. The rule of *Kentucky Diamond, supra*, was reiterated and extended so that if the grantor intends to omit any minerals from the conveyance he must do so explicitly in the deed.

Having clearly and unequivocally established the right to sever the surface and minerals thereunder, and having declared that a conveyance of "the minerals" conveyed *all* minerals, we turned our attention to the rights of the surface owner as opposed to the rights of the mineral owner. In *McIntire v. Marian Coal Co., supra*, the deed, following a severance of the minerals, granted the right "to use and operate the said land and the surface thereof" and included the right to use the surface for purposes "deemed necessary and convenient for the full and free exercise and enjoyment of any and all the property." 227 S.W. at 299. There was, however, a

---

8. See generally Vish, § 81.01[3] and nn. 7–8; Zillman and Tyler, The Common Law of Access and Surface Use in Mining, 1 J.Min.L. & Pol'y 267 (1985–1986); Note, The Common Law Rights to Subjacent Support and Surface Preservation, 30 Mo.L.Rev. 234 (1973); Comment, Broad-form Deed—Obstacle to Peaceful Co-existence Between Mineral and Surface Owners, 60 Ky.L.J. 742 (1971–1972) [hereinafter cited as Comment, Broad-form Deed] 54 Am.Jur.2d *Mines & Minerals* §§ 210–214; 58 C.J.S. *Mines & Minerals* § 273.

9. For an excellent analysis and history of broad form deeds, see Pfeiffer, Kentucky's New Broad Form Deed Law—Is It Constitutional?, 1 J.Min.L. & Pol'y. 57 (1985–1986).

*reservation* to the grantor which preserved "the free use of (the surface of) said land for agricultural purposes so far as such use is consistent with the rights hereby bargained (and) sold." *Id.*

The basic question presented in *McIntire* was what right did the mineral grantee have in the surface in the face of the agricultural reservation? We resolved the conflict by allowing the mineral grantee to use as much of the surface as it deemed necessary or convenient to its mining business, including use and occupancy of the entire surface, even that occupied by the surface owner's house and garden. The Court reasoned that where a deed contains no ambiguity it will be construed strictly according to its terms. We repeated the rule of construction that where there is ambiguity, the deed will be construed "most strongly" against the grantor in favor of the grantee. *Id.*

The Court disposed of the reservation to the surface owner by saying that "the mineral estate is dominant, superior and exclusive in every circumstance or condition when the owner thereof shall deem it necessary and convenient to make such use of the surface as the deed allows." *Id.* at 300. However, while giving the mineral owner such a broad and subjective right, the Court stated that *"such taking would have to be after satisfaction or adjudged compensation for such improvements ...."* *Id.* (emphasis added).

This Court thus declared the owner of the minerals to be the "dominant" estate and allowed the mineral owner to use the surface, *even in the face of a reservation on behalf of the surface owner.* Significantly, however, and too often ignored by many of our later cases, is the fact we provided for an award of *damages* to the injured surface owner.

In *Himler Coal v. Kirk*, 205 Ky. 666, 266 S.W. 355 (1924), this Court extended the principles of *Kentucky Diamond, Scott v. Laws,* and *McIntire, supra,* to a deed where the grantor conveyed the surface and reserved the minerals to itself. Nothing was said, however, about liability for damages to the surface owner.

In *Case v. Elkhorn Coal Corp.*, 210 Ky. 700, 276 S.W. 573 (1925) we again recognized the dominance of the mineral estate over the surface estate. However, for the first time, a restriction was placed by us on the mineral owner's use of the surface. "Clearly the defendant (mineral owner) *has the paramount right to the use of the surface in the prosecution of its business for any purpose of necessity and convenience, and of this it is to be the judge, and unless it exercised this power oppressively, arbitrarily, wantonly or maliciously, plaintiff (surface owner) cannot complain.*" *Id.* at p. 574 (emphasis added).

In addition to the damages allowed in *McIntire, supra,* this case limited the use of the surface by the mineral owner to all uses which were not oppressive, arbitrary, wanton or malicious. We relied on *McIntire,* so presumably, the surface owner could recover in damages for acts of the mineral owner that fit in any or all of the above proscribed categories.

Thus, restrictions on the previously unlimited, subjectively defined rights of mineral owners to use the surface estate appeared in our case law.

In *Wells v. North East Coal Company,* 255 Ky. 63, 72 S.W.2d 745 (1934), under the terms of a grant in a broad form deed, the Court held that a mineral owner could construct a railway across the surface, *even though all the coal conveyed had been mined.* One wonders why such action was not "oppressive or arbitrary", at the very least. However, the decision of the Court reaffirmed previous rulings that the mineral estate (albeit defunct) was dominant, and extended beyond the pale of a jury the subjective judgment of the mineral owner as to what is necessary to mine minerals. The Court said,

"(W)e are of the opinion that ... appellee (mineral owner) is not confined in the exercise of its rights in appellant's land (surface owner) to that which may in the opinion of a jury be absolutely necessary." *Id.* at 746.

In other words, the owner of mineral rights under a broad form deed may use the sur-

face to obtain the minerals in any way it deems necessary, and such judgment cannot be second guessed by a jury. The only limitation is the proscription against action which is oppressive, arbitrary, wanton or malicious. *Case v. Elkhorn Coal Company, supra.*

The cases discussed above all dealt with mining operations of the shaft, or deep mining, type. In *Rudd v. Hayden,* 265 Ky. 495, 97 S.W.2d 35 (1930), this Court recognized the rights of the mineral owner to use the surface which "may" include "open cut", "strip" or "hydraulic" methods of mining. *Id.* at 37.

The strip mining of *coal* was first presented in the case of *Treadway v. Wilson,* 301 Ky. 702, 192 S.W.2d 949 (1946). In 1907 the mineral estate was conveyed with "all easements necessary in mining and removing all said minerals...." Nearly 40 years later, the Court permitted the mineral owners to remove the coal by strip mining. The rationale of the opinion was the dominance of the mineral estate, and the only limitation upon that estate was the familiar litany of oppressive, arbitrary, wanton, or malicious conduct. The case was remanded for the trial court to determine whether the proposed method, "deadlifting," was oppressive. *Id.* at 951.

The last of the pre-*Buchanan* cases, *Gibson v. Sellars,* Ky., 252 S.W.2d 911 (1952), reiterated the long standing rule of construction that, in the interpretation of deeds, parol or other extrinsic evidence is not admissible except where the language of the instrument is "ambiguous or obscure." The specific ruling declared that in a deed excepting coal and "mineral rights", the latter term included oil and gas. *Id.*

Thus, the Kentucky Court came full circle. Broad form deeds convey all minerals (unless written exceptions are specifically made); the mineral estate is dominant, as are the concomitant rights to mine and use the surface (except for the prohibition against oppressive, arbitrary, wanton, or malicious conduct); and mining refers to and includes all forms of minerals extraction.

If there was ever any doubt under Kentucky law and under the broad form deeds about the ability of the mineral owner to use the strip mining techniques, and if there was ever any doubt about the extent to which the mineral owner could use the surface to retrieve coal and other minerals without liability to the owner of the surface, all such doubts were erased in 1956 with the rendition of *Buchanan.*

### BUCHANAN V. WATSON

The deed involved in that case was executed in 1903, and the grantee was the now famous John C.C. Mayo.[10] The deed severed the surface from the minerals, conveyed all minerals to the grantee, and provided a specific waiver of damages by the grantor for any injury to the surface caused by the grantee (or his assigns) in removing the minerals. The trial court found as a matter of fact, nearly fifty years later, that the only economical way to mine the coal was by strip mining. It also concluded that the strip mining process would destroy the surface. The surface owner argued that at the time of the execution of the deed there was no strip mining, the parties to the deed had not contemplated such mining techniques, and therefore such was not permitted under the terms of the deed, even though the deed did not address the type of mining that was to be done.

### The First *Buchanan* Opinion

In an unanimous opinion, originally rendered and later withdrawn, this Court held, citing *Rudd v. Hayden, supra,*

"(S)ince the plaintiff (miner) had the right to remove all the coal in, on and under the surface of this tract, the particular method contemplated by the parties (in the absence of language prohibiting other methods) does not preclude the plaintiff from utilizing a different process made possible by the development

---

**10.** For a brief history of Mr. Mayo and his archetypical deed see Pfeiffer, *supra,* note 9 at

58–61.

of modern machinery, when such process offers the only means of extracting the coal." [11]

More significantly, the Court, after determining strip mining was permissible under the broad form deed, found that the mineral owner must pay damages to the surface owner for the timber and surface destroyed in the process. To arrive at this result, the Court considered the method of mining contemplated by the parties and stated:

"It is clear from the deed the parties intended the coal would be mined in the customary manner prevailing when it was executed. The grantor relinquished his rights in the surface and any claims for damage he might have with respect to 'the use of the land' to the extent that the land (and the timber thereon) was utilized in the process of shaft mining. The release from liability is clearly limited to damage caused by this contemplated mining method. *The use of the surface and the extensive destruction of it are two different things. The new method will result in an invasion of the defendants' surface rights not anticipated by the parties to the deed and not within the scope of the release from liability. For this reason ... the plaintiff must pay reasonable compensation as damages to the extent he destroys, in the strip mining process, the defendants' interests in the surface and timber."* [12] (emphasis added).

The Court could have, but did not, cite the *McIntire* case, *supra*, as authority for this statement.

As stated, however, this opinion was withdrawn. The present opinion was substituted therefor and has become the focal point of much discussion, both pro and con.

### The Second *Buchanan* Opinion

Using logic not too dissimilar to that in the original opinion, an also unanimous court concluded that under the particular deed strip mining was permitted. Following the finding of the trial court that strip mining was the only feasible and economical way to mine the coal and using the authority of *Rudd v. Hayden, supra,* we affirmed the trial court. We said,

"In the present case, the Chancellor found from a reading of the deed that the parties thereto had not contemplated the strip and auger method of mining nor did they contemplate that any portion of the surface of the land would be destroyed or rendered valueless.... The deed by express language did not exclude or include this method of mining, although the proof shows that such mining methods were known and had been used prior to the date of the deed. *It seems clear that the parties intended the conveyance of the coal. To deny the right to remove it by the only feasible process is to defeat the principal purpose of the deed."* 290 S.W.2d at 42 (emphasis added).

With respect to damages the second opinion disagreed with the original. The Court construed the deed strongly against the grantors and applied what it perceived to be the clear and unambiguous words of the deed.

"The deed in this case conveyed virtually all rights necessary to carry out the mining of the coal, including a waiver of damages.... It was obvious that the estate reserved to the grantor was to be subservient to the dominant estate of the grantee. *The paramount purpose of the conveyance was to enable the grantee, or his successor in title, to remove the coal from under the surface of this land. The value of the land lay under the surface, not on it."* Id. at 43 (emphasis added).

Moreover, the Court declared that the validity and enforceability of a waiver of damages provision was not to be ques-

---

**11.** *Buchanan v. Watson,* original slip opinion, 3–4 (rendered September 30, 1955) withdrawn and modified 290 S.W.2d 40 (second—and final—opinion rendered on May 4, 1956).

**12.** *Id.* at 4.

tioned.[13] Adding a liberal dose of pragmatism to its reasoning, the second opinion stated,

"The rule has become so firmly established that it is a rule of property law giving the rights under many mineral deeds conveying much acreage in Eastern Kentucky. To destroy this rule now would create great confusion and much hardship in a segment of an industry that can ill-afford such a blow." *Id.* at 43–44.

Thus, under our decision in *Buchanan*, the owners of mineral rights under a typical broad form deed have the virtually absolute right to mine the minerals by any means, past, present or future, and in the course of such mining to literally obliterate the surface with little or no recourse for the surface owner.[14]

## POST–BUCHANAN CASES

In *Bevander Coal Co. v. Matney*, Ky., 320 S.W.2d 301 (1959), a suit by a surface owner against a mineral owner for damages, we declared *Buchanan* to be dispositive and limited damages to any actions of the miner that were oppressive, arbitrary, wanton or malicious. In *Blue Diamond Coal Co. v. Neace*, Ky., 337 S.W.2d 725 (1960), *Buchanan* was strengthened and expanded. This case involved auger mining under the terms of a broad form deed which contained a waiver of damages provision. The Court, in a suit for damages to the surface, declared that the owner of the mineral rights was entitled to a directed verdict unless its right to mine was exercised in an oppressive, arbitrary, wanton or malicious manner. We further stated:

*"The mere exercise of a right to mine in a particular fashion cannot of itself be classified as arbitrary, wanton or mali-*

cious. *It is the manner of the mining operation, as distinguished from the fact of its being carried on, that determines liability for damages."* *Id.* at 727 (emphasis added).

The attempt by the surface owner to have this Court overrule *Buchanan* was denied. The Court unanimously declared "it has always been the law that the grant or reservation of minerals carries with it the right to use the surface for the purpose of removing the minerals." *Id.*

In *Kodak Coal Company v. Smith*, Ky., 338 S.W.2d 699 (1960), the *Buchanan* doctrine was unanimously extended. We upheld auger mining under a broad form deed even though the trial court found that the coal could be mined by other methods, thus making auger mining unnecessary. The then status of Kentucky law was described as follows:

"The established law of Kentucky is that under a (broad form) mineral deed. . . . the grantee as the owner of the coal, has the right to extract it by the strip or auger method of mining, and if the operation is conducted properly the *necessary use, or destruction of the surface is within the scope of the rights granted under the deed."* *Id.* at 700 (emphasis added).

*Wiser Oil Co. v. Conley*, Ky., 346 S.W.2d 718 (1960), is arguably a change, aberration, or exception to the damage feature of the *Buchanan* doctrine. A lease, executed in 1917, gave the lessee oil and gas exploration rights. In the early 1960's the original lessee's successor began using a new technique, "water flooding", which literally flushes out oil beneath the surface estate. This process, though not unknown when the original lease was executed, was not then in general use. As a result of this

---

**13.** Even though the Court said it was enforcing the waiver of damages provision, it did, in fact, modify and limit it. The Court ruled that a waiver of damages provision does not exclude liability when the right to mine is exercised in an oppressive, arbitrary, wanton, or malicious manner. The Court thus modified a written contract, arguably making public policy.

**14.** We will not burden this opinion with an extensive description of the criticism of *Buchan-*

an. The interested reader may consult, for example, Randall and Pagoulatos, Surface Mining Environmental Quality: An Economic Perspective, 64 Ky.L.J. 549 (1975–1976); Schneider, Strip Mining in Kentucky, 59 Ky.L.J. 652 (1970–1971) [hereinafter cited as Schneider]; Note, Kentucky's Experience with the Broad Form Deed, 63 Ky.L.J. 107 (1974–1975); Comment, Broad-form Deed, supra note 9; Annot., 70 A.L. R.3d 383 (1976).

technique, there was much damage to the surface.

The surface owner sued for damages to his estate. The lessee, using *Buchanan* logic, argued not only the right to "water flood" to extract the oil, but also to be immune from damages. The Court allowed the new technique but awarded damages saying:

"There is a sound basis for the rule that a deed or lease of minerals carries with it the right to use as much of the surface, or other property, as may be reasonably necessary to exploit the minerals. We also are aware of the well-known concept that where the injury done to the property was of an anticipatory character, such a result would constitute damnum absque injuria. But *where, as here, there is no express release of damages and a new method of withdrawing oil is employed, which was not in the minds of the parties at the time the lease was executed and which will destroy or substantially damage the landowners remaining estate, principles of justice and humanity would require that reasonable compensation be paid the landowner for the destruction wrought.*" *Id.* at 721 (emphasis added).

The Court distinguished *Buchanan* by pointing out there was no waiver of damages in the questioned oil and gas lease, as there was in the *Buchanan* mineral deed. Even though it may be conceded that, *technically, Buchanan* is distinguishable for the reason given, the problems resulting from using the new water flooding method are identical to those encountered in *Buchanan.* The surface owner is none the less greatly injured by a method of mining clearly unknown and not contemplated by the parties to the original deed or lease.

A seemingly slight modification of *Buchanan* and *Kodak, supra,* appeared in *Blue Diamond Coal Co. v. Campbell,* Ky., 371 S.W.2d 483 (1963). A "Mayo" type broad form deed was involved in a suit for damages by the surface owner against the mineral owner. In discussing the evidence of damage, the Court said,

"(T)here was no evidence even to suggest that these operations (strip and auger mining) were so completely unnecessary or so out of line with customary strip or mining practices as to be considered oppressive, arbitrary, wanton or malicious." *Id.* at 486.

While the Court hewed the *Buchanan* damage line, it declared that strip and auger mining could justify damages and were not *per se* proper if they were "completely unnecessary" or "so out of line".

In *Croley v. Round Mountain Coal Co.,* Ky., 374 S.W.2d 852 (1964), mineral rights were retained under a reservation. Damages were allowed as the result of the mineral owner casting waste material on the surface, where the material came from *other mines.* This practice was declared to be an action of the mineral owner carrying on auger strip mining in an oppressive, arbitrary, wanton or malicious manner. *Buchanan* et al. were followed with the exception noted. Again, the Court was unanimous in its view.

In 1968, a serious and major break occurred in the unanimity of the Court with respect to the continuation of the *Buchanan* doctrine. An action for declaratory judgment alleged that the owner of minerals, under a broad form deed, had no right to remove coal by strip or auger mining. *Martin v. Kentucky Oak Mining Company,* Ky., 429 S.W.2d 395 (1968). The trial court followed *Buchanan* with respect to the *right* to strip mine but allowed damages for injury to the surface. On appeal, a majority of four judges reversed the trial court's decision with reference to damages. Citing *Buchanan* and the cases that followed it, the Court refused to reconsider its previous position. *Id.* at 396–397. After summarizing the arguments, we said:

"*We do not mean to discredit the arguments on behalf of the landowners. They have elements of merit and a degree of persuasiveness. However, they do not have the overwhelming force to prevail against the long established rule of our previous cases upon which the property rights have vested.*" *Id.* at 399 (emphasis added).

In other words, the principle of *stare decisis* controls primarily because too many people have property or investment rights which must not be upset or changed. In passing, we note that the *Martin* Court distinguished *Wiser Oil, supra,* from *Buchanan,* for the reason that there was no waiver of damages provision in the oil and gas lease in *Wiser.* The Court rather churlishly stated:

> "Perhaps *Wiser* is distinguishable from *Buchanan* on some other basis, other than that stated in the opinion in *Wiser,* or perhaps it is a departure from *Buchanan. In any event we do not feel compelled in this opinion to explain, justify, reconcile or distinguish Wiser. The court has decided to adhere to Buchanan whether or not it conflicts with Wiser."* *Id.* at 399 (emphasis added).[15]

Finally, we refer to the case of *Commerce Union Bank v. Kinkade,* Ky., 540 S.W.2d 861 (1976). The surface owners brought an action against the mineral owners, seeking a declaration that the mineral conveyance in question did not grant the right to mine coal by the strip or open pit method. The trial court ruled that the particular conveyance did not grant the right to strip mine or open pit mine. We affirmed. The mineral deed in question was not a broad form deed,[16] and the Court clearly so stated.

> "This court has reexamined those cases in which we have considered the 'broad form' deed and has concluded that *the deeds involved in this proceeding, and as quoted herein, do not contain language that is so extensive as to subordinate the rights of the surface estate to the demands of the mineral estate."* *Id.* at 864 (emphasis added).

The effect of this case was to restrict the virtually unlimited rights of the mineral owners as to the surface estate to broad form deeds and to require that each challenged deed be considered on a case-by-case basis. The Court clearly affirmed its previous positions on the "Mayo" type deeds, saying:

> "We have consistently upheld what has been identified as the 'broad form' or 'Mayo deed' and in so doing have concluded that those deeds grant such overwhelming mining rights that the mineral owner in fact has the right to use the surface of the land, part or all of it, in recovering the coal acquired by the deeds." *Id.*

To the extent *Commerce Union* is inconsistent with the present opinion, *Commerce Union* is overruled.

## SURFACE USE AND DAMAGES

Since *Buchanan* and its progeny still stand as authority with regard to the rights of mineral owners under broad form deeds as opposed to those of innocent surface owners, we again consider *Buchanan.*

In any analysis of *Buchanan,* there are two major points of the decision to be considered. The first deals with the right of mineral owners under a broad form deed to strip mine and to use all of the surface to obtain the minerals. The second deals with the responsibility of the mineral owner to answer to the surface owner, in damages, for the use of that surface.

■ Very simply stated, under the present status of Kentucky law, the owner of mineral rights under a broad form deed may use the surface—all of it—to acquire the minerals lying thereunder. The only restriction (unless one appears in the deed) is that the use of said surface may not be oppressive, arbitrary, malicious or wanton. We have reexamined the cases which led to this rule of law and frankly find no fault with them. The conveyance of mineral rights for valuable consideration is a valid exercise of the rights of the parties to make an agreement, no matter who prepared the instrument. Extrinsic evidence may not be used to vary or explain these written instruments so long as they are unambigious. The provisions in typical broad form deeds are, *beyond cavil,* clear and unambiguous. They are, in fact, *overwhelming* in their language to demonstrate

---

**15.** But see 429 S.W.2d at 400–403 (Hill, J., dissenting) (to be discussed later in this opinion).

**16.** For an extensive description of the deed in question, see 540 S.W.2d at 862–863.

an intent to convey away the rights to the minerals described. The right to the minerals carries with it the right to mine them. That a certain method of mining was known at the time the document was executed is simply not relevant. A sale implies the right to obtain and use the item sold. Without it there is, in effect, no sale. It can be argued that the parties in their wisdom recognized that fertile minds will always seek and achieve new ways of doing things, and therefore generally, if not specifically, contemplated new mining techniques which were faster, cheaper and better.

So long as the method of mining is not oppressive, arbitrary, wanton or malicious, the minerals may be removed by the owner of the mineral rights, which include the right to use the surface. We conclude this part of *Buchanan* must be affirmed.

However, with the second phase of *Buchanan*—the damages element—we disagree. As we consider the overruling of any case, or any line of cases, we are not unmindful of the desirability of continuity and its resulting predictability in the body of law. The doctrine of *stare decisis* impels us to overrule precedent only with considerable thought and care. As we stated in *D & W Auto Supply v. Department of Revenue*, Ky., 602 S.W.2d 420 (1980):

> "The maxim is 'Stare decisis et non quieta movere,' which simply suggests that we stand by precedents and not disturb settled points of law. Yet, this rule is not inflexible, nor is it of such a nature as to require perpetuation of error or illogic. As we stated in *Daniel's Adm'r v. Hoofnel*, 287 Ky. 834, 155 S.W.2d 469, 471–72 (1941) (citations omitted):
>
> The force of the rule depends upon the nature of the question to be decided and the extent of the disturbance of rights

and practices which a change in the interpretation of the law or the course of judicial opinions may create. Cogent considerations are whether there is clear error and urgent reasons 'for neither justice nor wisdom requires a court to go from one doubtful rule to another,' and whether or not the evils of the principle that has been followed will be more injurious than can possibly result from a change.

> *Certainly, when a theory supporting a rule of law* is not grounded on facts, or upon sound logic, or *is unjust*, or has been discredited by actual experience, *it should be discarded, and with it the rule it supports." Id.* at 424 (emphasis added).

When the continuation of a legal doctrine or a precedent is detrimental to the public interest, we must reconsider it. *Payne v. City of Covington*, 276 Ky. 380, 123 S.W.2d 1045 (1938).[17] Because we believe that the principles of justice dictate it, and that the public interest will be best served, we overrule that part of *Buchanan* which literally applies and upholds the waiver of damages provisions in broad form deeds. We also overrule any cases which hold that the mineral owner can use and damage the surface without the payment of damages, even though no waiver of damages claim is present in the deed. We hold that, subject to the applicability of this decision, whenever the owner of minerals under a broad form deed in exercising the right to remove those minerals from under the surface, causes injury to the surface, the mineral owner shall respond in damages to the owner(s) of that surface. The sole exception would be where the conveyance expressly sets out the methods of mining that may be employed and a waiver of damages from the use of such methods. It is common knowledge, and this Court takes judicial notice of the fact,

**17.** See also *Hilen v. Hays*, Ky., 673 S.W.2d 713 (1984). As Justice Cardozo said in his book, *The Nature of the Judicial Process:*

> "But I am ready to concede that the rule of adherence to precedent, though it ought not be abandoned, ought to be in some degree relaxed. I think that when a rule, after it has been duly tested by experience, has been

found to be inconsistent with the sense of justice or with the social welfare, there should be less hesitation in frank avowal and full abandonment."

B. Cardozo, The Nature of the Judicial Process 142, 150 (1922); *noted in* Comment, Broad-form Deed, supra note 9 at 752 n. 51.

that in many cases the owner of the minerals in exercising the right to mine can and does cause tremendous injury to the surface, even to the extent of obliterating the entire area, including trees, gardens, crops, homes, barns and all improvements. This fact, and the legal doctrine underpinning it, leads to the total destruction of the rights of the surface owner. In effect, the surface owner has nothing to enjoy for the "ownership" of the surface. This interest in the land is not only the servient estate; it is no estate.

Surely it is not fair, surely it is not just, to allow such a situation to exist.

A ray of light was directed to the matter of damages in the *McIntire* case, *supra.* The Court allowed the mineral owner to use and occupy the whole surface, but said: "(S)uch taking would have to be after satisfaction or adjudged compensation for such improvements (as the plaintiff's house and garden)...." 227 S.W. at 300. That ray of light was soon dimmed (although not *specifically* extinguished) by the cases that ensued, culminating in *Buchanan.* Another ray of light, extinguished before it appeared in the law books, was the first version of *Buchanan.*[18] In what appears to be a just, fair and equitable result, that aborted decision mandated damages to the injured surface owner.

Not too long after *Buchanan,* we decided *Wiser Oil v. Conley, supra.* Although technically distinguishable from *Buchanan,* the legal principles enumerated therein showed that the Court had some doubt about permitting the unfettered destruction of the surface without compensation to the owner thereof. We declared that where a new method of withdrawing oil caused damage to the surface, principles of "justice and humanity" required reasonable compensation be paid to the surface owners. 346 S.W.2d at 721. Why would not those same principles of "justice and humanity" apply to *coal mining* and, a fortio-ri, to the broad form deed provisions which eliminate any rights of the surface owner and, in effect, *eliminate* his estate?

Judge Hill expressed these principles in his now famous dissent in *Martin v. Kentucky Oak Mining Company,* 429 S.W.2d at 400–403. Citing *Wiser,* and referring to an attempt to comport it with *Buchanan,* he stated, "*Wiser* and *Buchanan* are as inconsistent as sin and salvation." *Id.* at 402. Referring to what he obviously perceived to be a lack of justice, fair play, and proper public policy, he continued:

"I am shocked and appalled that the court of last resort in this beautiful state of Kentucky would ignore the logic and reasoning of this great majority of other states and lend its approval of encouragement to the diabolical devastation and destruction of a large part of the surface of this fair state without compensation of the owner thereof." *Id.*

These words point out what we believe to be an accurate analysis of a court-adopted and court-nurtured public policy which permits such a grossly unfair and illogical situation to exist.

It is clear that Kentucky is standing naked and alone in the view under *Buchanan.*[19] While this Court does not posit its decisions on a "numbers" game, certainly we should not be oblivious to the overwhelming authority and public policy of our sister states. Only Kentucky has reduced the property rights of the surface owner to a mere license to occupy the surface of the land until such time as the mineral owner elects to destroy the surface in order to remove the coal and other minerals without the payment of damages to the surface owner. It is time to change. It is time to bring our public policy into a state of consistency with fairness, justice, and social welfare.

It is highly unlikely that any parties to a deed or lease would enter into an agree-

18. See note 11, supra.

19. *Barker v. Mintz,* 73 Colo. 262, 215 P. 534 (1923); *Franklin v. Callicoat,* 119 N.E.2d 688 (Ohio 1954); *Stewart v. Chernicky,* 439 Pa. 43, 266 A.2d 259 (1970); *Doochin v. Rackley,* 610 S.W.2d 715 (Tenn.1981); *Phipps v. Leftwich,* 216 Va. 706, 222 S.E.2d 536 (1976); *West Virginia-Pittsburg Coal Co. v. Strong,* 129 W.Va. 832, 42 S.E.2d 46 (1947). See also the additional authorities cited in note 8, supra.

ment which creates two separate estates in land knowing or contemplating that one of those estates—the surface—could and would be totally destroyed, and leaving that estate owner without anything, without damages to the injured party being allowed. The obliteration of the surface would never have been anticipated by the grantor of the mineral estate. By any standards, it is grossly unconscionable to allow such harm without the awarding of damages. To allow this by judicial fiat or by judicial approval of such a contractual provision is not logical, nor is it fair, just, or in the public interest.

We can no longer countenance the existence of such a judicially created public policy, and therefore, as stated, we overrule that part of *Buchanan v. Watson* which denies damages to the owner of the surface of land.

Because of the possible adverse effect of our decision on mineral rights acquired in reliance on *Buchanan,* we limit the application of this decision by excluding from its effect all conveyances by broad form deed, and leases and mining efforts under broad form deeds, made between the effective date of *Buchanan,* May 4, 1956, and the initial rendition date of this decision July 2, 1987. Such conveyances, leases and mining efforts shall continue to be controlled by *Buchanan.* If a conveyance or lease was made while *Buchanan* was in effect, any future conveyance, lease or mining efforts pertaining to the same property shall continue to be controlled by *Buchanan.*

In those situations where the decision enunciated herein is applicable, whenever the mineral rights under a broad form deed include the right to use the entire surface to extract the minerals, the mineral owner may do so, but must respond to the surface owner for all damages to that estate. The measure of damages shall be the difference in the market value of the surface estate, including all improvements thereon, immediately before and immediately after the use of the surface by the mineral owner. "Use of the surface" shall include any and all reclamation of the surface by the mineral owner. *Revenue*

*Cabinet, Commonwealth v. Amax Coal Co.,* Ky., 718 S.W.2d 947 (1986).

## THE CONSTITUTIONAL CHALLENGE TO KRS 381.930 THROUGH 381.945 (1984)

By enacting KRS 381.930 et seq. the General Assembly belatedly responded to our decision in *Buchanan.* If these statutes are constitutional much strip mining, particularly that done under the scope of broad form deeds, will disappear.

As we previously noted, in the *Akers* case the Federal District Court certified the constitutional question to this Court. On the other hand, in *Baker v. Wooten* the trial court addressed the question of constitutionality and declared the statutes to be constitutional.

Basically, the opponents of the legislation attack it on four grounds: (1) that it impairs the obligation of contracts and is not a valid exercise of the state's public policy; (2) that it deprives the affected owners of mineral rights of their property without due process of law; (3) that it effects a taking of the property of the mineral owners without just compensation; and (4) that it constitutes an illegal legislative incursion into the judicial authority.

The questioned statutes are as follows: "381.930. **Purposes of KRS 381.935 to 381.945.**—The purposes of KRS 381.935 to 381.945 are as follows:
(1) To facilitate and require the demonstration of a clear understanding between the owners of surface and mineral estates in land concerning their respective rights to use and occupy or injure the surface of the land;
(2) To protect the security of titles to land and improvements thereto;
(3) To promote the free alienability of land;
(4) To prevent hardship and injustice to surface or mineral owners arising from uncertainty of the law;
(5) To promote the conservation and the full and efficient use of all natural resources of the state, including the land, the making of improvements to the land,

the growth of agriculture, the development of new industry and the general economic well-being of the state and its people;

(6) To codify a rule of construction for mineral deeds relating to coal extraction so as to implement the intention of the parties at the time the instrument was created; and

(7) To foster certainty and uniformity in the operation of the law. (Enact.Acts 1984, ch. 28, § 1, effective July 13, 1984.)

**381.935. Definitions.**—For the purpose of KRS 381.940, "method" and "methods" mean underground, surface, auger, or open pit mining and nothing in KRS 381.940 shall be interpreted to adversely affect the use of modern equipment or machinery with respect to mining methods permitted under KRS 381.940. (Enact.Acts 1984, ch. 28, § 3, effective July 13, 1984).

**381.940. Rules of construction for mineral deeds relating to coal extraction.**—*In any instrument heretofore or hereafter executed purporting to sever the surface and mineral estates or to grant a mineral estate or to grant a right to extract minerals, which fails to state or describe in express and specific terms the method of coal extraction to be employed,* or where said instrument contains language subordinating the surface estate to the mineral estate, *it shall be held, in the absence of clear and convincing evidence to the contrary, that the intention of the parties to the instrument was that the coal be extracted only by the method or methods of commercial coal extraction commonly known to be in use in Kentucky in the area affected at the time the instrument was executed,* and that the mineral estate be dominant to the surface estate only for the purposes of coal extraction by the method or methods of commercial coal extraction commonly known to be in

use in Kentucky in the area affected at the time the instrument was executed." (Enact.Acts 1984, ch. 28, § 2, effective July 13, 1984.) (emphasis added).

**381.945. Written agreement in deed directing how surface to be reclaimed.** —In any deed in which the minerals are severed from the surface, the present owners of the surface rights may enter into a written agreement directing how the surface shall be reclaimed, and how the property shall be left after the extraction of the minerals, and in compliance with federal and state rules and regulations. (Enact.Acts 1984, ch. 28, § 4, effective July 13, 1984.)

The legislation, as a whole, applies to all written instruments, past, present and future, wherein the surface of land and the mineral estate are severed. It includes a rule of construction. KRS 381.940. The essence of this particular statute is that if the instrument in question does not *specifically* describe the method of "coal extraction" to be used by the mineral grantee, it "shall be held" that the parties to the instrument "intend(ed)" that the coal shall be mined by whatever "commercial" methods were commonly known to be in use in Kentucky in the area affected at the time the instrument was executed. *Id.*

Presumably, the precise mandate of the statute, viz., "it shall be held," is directed to any court interpreting the questioned document. Specifically, if the document is silent as to the method of coal mining [20] the type of mining shall be as dictated by the statute unless there is "clear and convincing evidence to the contrary." *Id.* The effect of this language is to permit parol or other evidence to vary or explain the terms of what is otherwise an unambiguous document.

With respect to broad form deeds, it is obvious that the effect of this statute is to prevent all strip mining. The evidence in this case and the evidence generally [21] is

**20.** It should be noted that although the statute applies to *any* estate wherein the surface and minerals are separated, the same statute limits its application to *coal mining.* Presumably, all other minerals conveyed could be mined by any method, in line with the reasoning of *Buchanan,* et al.

**21.** See *Roberts v. Twin Fork Coal Co.,* 223 F.Supp. 752, 752–753 (E.D.Ky.1963) (in the 1890's "virtually all mining was accomplished

that strip mining, as it is practiced today, was non-existent in the early 1900's, when most, if not all, of the broad form deeds were executed. This Court takes judicial notice of that fact. The statute refers to the intentions of the parties to the instrument and purports to create a rebuttable presumption.[22] The fact is no such "clear and convincing evidence" is available, because there was no commercial strip mining in those years. In examining the statute, we again take notice of this fact. The statute thus converts a rebuttable evidentiary presumption into an irrebutable one which becomes a substantive rule of law.

█ We believe this is constitutionally impermissible. The power to make rules and to determine substantive issues of law is solely within the power of the judiciary. Sections 27, 28, and 109 of the Kentucky Constitution are as follows:

"*§ 27 Legislative, executive and judicial departments*

The powers of the government of the Commonwealth of Kentucky shall be divided into three distinct departments, and each of them be confined to a separate body of magistracy, to wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another.

*§ 28 Power of one department not to be exercised by the other*

No person, or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted.

*§ 109 The judicial power; unified system; impeachment*

The judicial power of the Commonwealth shall be vested exclusively in one Court of Justice which shall be divided into a Supreme Court, a Court of Appeals, a trial court of general jurisdiction known as the circuit court and a trial court of limited jurisdiction known as the district court. The court shall constitute a unified judicial system for operation and administration. The impeachment powers of the general assembly shall remain inviolate."

The separation of powers between the three equal branches of government is one of the most important facets of our Kentucky Constitution.[23] Stating this constitutional principle is simple; applying it is not always so easy. However, it is crystal clear that courts are the proper forums to determine the issues presented in the interpretation of *past* transactions, as in this case. "*It is the distinctive nature of judicial power to determine rights and obligations with reference to transactions that are past....*" *Rohde v. City of Newport*, 246 Ky. 476, 55 S.W.2d 368, 370 (1932) (emphasis added). *See also Elliott v. Nicholas*, 67 Ky. (4 Bush) 502, (1868).

█ The General Assembly has, by enacting this statute, reached across the years and has arbitrarily determined the rights of the parties and their successors to deeds and other documents. By declaring this act improper as being a clear incursion into judicial power, we do not denigrate or even comment on the nature of the reason the General Assembly so acted. It may well have been a legitimate public purpose that motivated the passage of this legislation. Nevertheless, the policy behind this

---

by the shaft method.... *After World War II* it became profitable to extract the coal by stripping and augering.") (Emphasis added.); Schneider, supra note 15, at 652:

"Proponents of strip mining will argue ... that strip mining was a common practice in the early 1900's. While the existence of such early strip mining practices cannot be denied, it was for the most part confined to shallow seams, outcrops near the surface, and the flat areas of Western Kentucky. The real controversy developed following World War II, when science and technology introduced larger and more efficient machinery for biting into the mountain slopes of Eastern Kentucky."

See also Note, Reclamation of Strip Mine Spoils, 50 Ky.L.J. 524 (1961–1962), *cited in Martin v. Kentucky Oak Mining Co.*, 429 S.W.2d at 401 (Hill, J., dissenting).

**22.** KRS 381.940 ("in the absence of clear and convincing evidence to the contrary").

**23.** For a discussion of this doctrine, see *Legislative Research Commission v. Brown*, Ky., 664 S.W.2d 907, 911–914 (1984).

bill is simply not relevant to our decision. Our sworn duty is to enforce the Kentucky Constitution. When an act of the General Assembly violates the principle of the separation of powers, we are obligated to vitiate such legislative action. We do so now.

A statute that functions retroactively to determine the meaning of a preexisting deed or lease is constitutionally impermissible because this impairs the obligation of a contract. In *Department for Natural Resources v. No. 8, Ltd.*, Ky., 528 S.W.2d 684 (1975), we held another legislative approach, similar in tactics, as an unconstitutional attempt "to change the relative legal rights and economic bargaining positions of many private parties under their contracts." At 686–87. The General Assembly can specify prospectively what rights are granted or denied by use of certain language in contracts written in the future, but they cannot affect vested property rights.

In reaching this decision, we only declare that part of the legislation unconstitutional which—by virtue of the presumption created—affects past transactions, specifically, KRS 381.940. Moreover, we find it unnecessary to discuss the other grounds of alleged constitutionality that have been raised and we leave them to another day.

In the case of *Akers v. Baldwin*, the law is so certified. In the case of *Baker v. Wooten*, the decision of the trial court is reversed and the case is remanded to that court for proceedings consistent with this opinion.

Entire court sitting.

GANT, and LEIBSON, JJ. concur.

VANCE, J., concurs by separate opinion, in which GANT, J., joins.

STEPHENSON, J., filed a separate opinion concurring in part and dissenting in part, in which WINTERSHEIMER, J., joins.

LAMBERT, J., files a separate opinion concurring in part and dissenting in part, in which WINTERSHEIMER, J., joins.

VANCE, Justice, concurring.

I concur in the result of this opinion.

I agree that the sale of mineral rights by deed of severance from the surface carries with it the right to remove the mineral. This was the holding in *Buchanan v. Watson*, Ky., 290 S.W.2d 40 (1956), and in such earlier cases as *Himler Coal Company v. Kirk*, Ky., 266 S.W. 355 (1924). There is an implied right, as a matter of necessity, to remove that which has been purchased, even when the document of sale does not expressly create such a right. As was succinctly stated in *Himler Coal Company, supra:*

> "The effect of the conveyance by the Tug River Coal and Salt Company to Barrett of the surface only was the same as if Barrett had been the owner of the entire estate and had conveyed to the Tug River Coal and Salt Company the coal beneath his land, and if he had done that, he could not now be heard to say: 'it is true that I conveyed this coal to the Tug River Coal and Salt Company, but I didn't grant to it any right to remove it.' In other words, he cannot say 'Yes, I sold it to them, but I am not going to let them have it.' "

*Himler Coal Company, supra,* dealt with an underground mine. *Buchanan, supra,* dealt with strip mining. Strip mining, of course, does far greater damage to the surface, and it follows that the sale of coal does not carry with it the right to strip mine if there is any other reasonable way to remove the coal with less damage to the surface.

Although the sale of the coal necessarily carries with it the implied right to remove the coal, it does not follow that the surface owner can be damaged with impunity without liability. In the underground mine cases, the mineral owner, as a matter of necessity, had the right to open a shaft to get to the coal and the right to necessary easements across the surface to transport the coal after it had been mined. These were only such rights as were absolutely necessary, and liability did attach for damage to the surface that was not strictly

necessary. *Himler Coal Company v. Kirk, supra.*

The mineral owner had no right to cause subsidence and destroy the surface without liability. Thus, the sale of coal, in itself, and without any express waiver of damage, gave the mineral owner some limited use of the surface, but no right to utterly destroy it.

The "broad form" deeds of conveyance contained a long list of mining rights which gave to the mineral owner almost unlimited right to use the surface without liability. It was this long list of mining rights which impelled the court in *Buchanan, supra,* to hold that the surface owner had voluntarily waived the right to recover for the damage inflicted by strip mining.

The express reservation of mining rights contained in the "broad form" deeds, including in some instances the waiver of damage for subsidence and for use of timber below a certain size, plainly indicates to me that the parties to these deeds contemplated deep mining only. Timbers below the size enumerated were used for roof supports in underground mines, but would not be useful in strip mines. Subsidence occurred when pillars were pulled in underground mines. I believe the *Buchanan* court erred when it did not limit the waiver of damages contained in the "broad form" deeds to cases involving underground mines, and for that reason I concur with the majority which today overrules that portion of *Buchanan, supra.*

Nevertheless, the opinion in *Buchanan, supra,* has been the law in this Commonwealth from 1956 until today. Stability in the law is important, and citizens should be free to conduct their business in view of recognized principles of law. Because many contract rights and business obligations have vested and have been incurred since the 1956 decision in *Buchanan* in reliance upon that opinion, the majority has deemed it proper to protect those bona fide contract rights and obligations by giving prospective effect only to this decision as it affects those situations.

The cases which have allowed strip mining without liability for damage to the surface have done so upon the theory advanced in *Buchanan, supra,* that damages had been waived, or under a misperception that *Buchanan* was premised upon the theory that the granting of overwhelming mining rights in the "broad form" deeds authorized strip mines.

No case, to my knowledge, has held that the utter destruction of the surface is permissible simply because it is a matter of necessity or a necessary mining right in strip mining. It is true that in strip mining the only method in which the coal can be mined often utterly destroys the surface. I do not believe that the line of authority which grants to the owners of coal in underground mining situations the right of necessity to use the surface in such a manner as is necessary to remove the coal (but which as a practical matter did not destroy the surface) should be extended to strip mining situations and permit, as a matter of necessity, the utter destruction of the surface.

I therefore agree with the majority that severance of the coal from the surface carries with it the right to remove the coal, including the right to strip mine if that is necessary. The destruction of the surface occasioned by strip mining, however, must be paid for and should not be permitted as a necessary mining right without liability for damage to the surface unless such damage is expressly waived, and except in those cases that remain protected by prospective application of *Buchanan v. Watson.*

GANT, J., joins in this concurring opinion.

STEPHENSON, Justice, concurring in part and dissenting in part.

It is gratifying that, at long last, this court has taken the trouble to read *Buchanan* and recognize that the holding there is that ownership of the coal gives the right to strip mine. This recognizes the myth of the "broad form deed" as not being the genesis of the right to strip mine. Unfortunately, the "broad form deed" cases do not reflect this. The "broad form

deed" cases are all result oriented, wander back and forth on reasons for the result, and all have the mistaken premise that the "broad form deeds" gave this power to strip. This myth extends up to and including *Commerce Union* "language that is so extensive as to subordinate the rights of the surface estate to the demands of the mineral estate." After *Commerce Union*, in 1976, we had one rule of mineral law for Eastern Kentucky, i.e., *Buchanan*, "ownership of the coal gives the right to strip"; and one for Western Kentucky, i.e., "ownership of the coal does not give the right to strip." It is noted in the majority opinion that the mineral deed there was not a broad form deed. I wonder if any member of the court prior to *Commerce Union* even bothered to read *Buchanan*. The majority observes that *Commerce Union* restricted virtually unlimited rights of mineral owners to broad form deeds. *Buchanan* and *Commerce Union* are in absolute conflict. I do not understand the language that *Commerce Union* is overruled to the extent it is inconsistent with the majority. It should be overruled unequivocally, lest there be a lingering suspicion that there is still one rule of law for Eastern Kentucky and another for Western Kentucky. It should be made clear that ownership of the coal gives the right to strip mine even in Western Kentucky.

My concern that there may yet be two rules of law in Kentucky stems from language in the majority that:

> ... under ... *Buchanan*, the owners of mineral rights under a typical broad form deed have the absolute ... right to mine the minerals by any means....

> . . . . .

> ... the owner of mineral rights under a broad form deed may use the surface—all of it—to acquire the minerals lying thereunder.

> . . . . .

The provisions in typical broad form deeds are, *beyond cavil*, clear and unambiguous. They are, in fact, *overwhelming* in their language to demonstrate an intent to convey away the rights to the minerals described....

(I had always supposed that any deed conveying the mineral did so without the necessity for overwhelming language, whatever that is.)

I think the majority unfortunately affirms the holding in *Buchanan*, giving the right to strip incident to the ownership of the minerals. With the above-quoted language and with similar language sprinkled throughout, I have nagging doubts.

I have always regarded *Buchanan* as an aberration in the law of minerals. There is absolutely no prior authority for the holding. The statement in *Buchanan*, quoted in the majority as a dose of pragmatism:

> The rule has become so firmly established that it is a rule of property law giving the rights under many mineral deeds conveying much acreage in Eastern Kentucky. To destroy this rule now would create great confusion and much hardship in a segment of an industry that can ill-afford such a blow.

is pure sophistry. There was no such rule of law until *Buchanan* manufactured it.

This majority opinion represents a radical departure in mineral law. While the "broad form deed" cases assumed the right to strip mine from the terms of the deed, we will now have an implied right to strip mine in all mineral deeds save those with a specific prohibition. With all of the controversy about the "broad from deed" cases, we will now add practically all mineral deeds. I am sure the significance of this has not been lost upon the parties.

I am at a loss to understand why the majority would cite *Rudd v. Hayden* for the proposition that this court has recognized the rights of the mineral owner to use the surface which "may" include "open-cut, strip, or hydraulic" methods of mining.

*Rudd* involved a controversy over whether the terms of a mineral deed gave the right to quarry limestone. This court construed "mineral cement," which was included among coal, clay, oil, and gas, etc., as including limestone. One of the contentions of the surface owner was that limestone was quarried, not mined, and only

such minerals as are mined were conveyed. The court dismissed the argument, stating that oil and gas are not "mined" and, for some reason, went on to say: "... the term mine is not limited to those cases where a shaft is sunk into the ground but may include 'open cut,' 'strip,' or 'hydraulic' methods of mining." This opinion did not recognize any of the rights stated in the majority opinion. This is a dictionary-type definition which recognizes only a definition of a word. For some unknown reason, *Rudd* was cited in *Buchanan.*

The majority opinion displays a fundamental misunderstanding of many of the cases cited in the opinion. *McIntire,* which did not involve a Mayo or broad form deed, construed the necessary and convenient mining rights contained in the mineral deed. The court held that the coal company had the right to erect and maintain houses, tipples, stores, road or other structures. It was further held that the *qualified* right reserved to the surface owner to use the land for agricultural purposes *so far as such use is consistent with the rights hereby conveyed* meant that it was plain that such use was warranted only to the extent that it did not interfere with the right of the company to build houses, shops, buildings, etc. This holding is in accordance with the express language of the deed.

Then, by dicta, the opinion says that by showing the necessity or convenience, the company could occupy all of the surface, taking the house and garden after compensation for the *improvements.* This dicta noted that damages would be assessed for improvements. No one ever thought that the surface owner was entitled to damages for use of the surface in a state of nature.

In *Himler,* there was liability to the surface owner. There, the mineral deed had *no* reservation of mining rights, and the court held that *necessary* mining rights were implied and that the company had a right to build a railroad to transport coal across the surface. The court further held from the evidence that the railroad was a way of convenience and not necessity and that the surface owner had the right to sue

for damages if the company has taken any of the surface for which there was not a strict necessity. The principles in *McIntire* are not involved.

In *Case,* the mineral deed appears the same as *McIntire,* not a Mayo or broad form deed. The court held that in the exercise of *necessary* and *convenient* mining rights the company had a right to locate and construct a transmission line over the surface and that the fact that the line had not been constructed in ten years was not an arbitrary exercise of power by the company. No damages were allowed in this opinion. The opinion did limit the exercise of necessary and convenient mining rights to the extent that the exercise of the powers were not oppressive, arbitrary, wanton, or malicious. In the 1920's, the court was construing the term "necessary and convenient" mining rights, and *Case* represents a limitation if convenient rights are exercised oppressively, etc.

In *Wells,* the court held that where necessary and convenient mining rights are conveyed in a mineral deed (here, Mayo deed), the coal company is not confined in the exercise of its rights to the surface to that which, in the opinion of a jury, would be absolutely necessary. The company is only responsible for damages if, in the exercise of the rights, it acted arbitrarily, wantonly, or maliciously. Another issue was that a tram road had been constructed over the surface after the coal had been mined and exhausted. This tram road hauled coal from other lands across the surface. The court pointed out that the mineral deed expressly gave this right to the coal company.

The court mentioned only the necessary and convenient mining rights in the mineral deed and did not base any of the rulings on the broad form deed. Oppressive or arbitrary exercise of rights was not involved at all.

*Treadway* held that the owner had the right to strip mine for the reason that the mineral owner has the paramount right to use the surface, citing *Case* and others. *Buchanan* did not cite *Treadway* as authority for the right to strip mine. This

opinion reversed the trial court for not permitting an answer to be filed, alleging that stripping would be an "oppressive" exercise of the mineral owner granted privileges. The trial court was directed to hear evidence upon the issue and determine the rights of the parties. We hear no more of *Treadway*, and I have never seen or heard a proponent of the "broad form deed" suggest this solution to determine the rights of the parties.

I approve of the majority overruling the damages portion of *Buchanan*. I never thought that rules of law pronounced in logical and reasonable cases involving underground mining should have been used as authority for the denial of damages for strip mining the surfaces.

The broad form deeds really evolve down to granting necessary and convenient mining rights for underground mining.

I am gratified that the majority opinion acknowledges that obliteration of the surface would never have been anticipated by the grantor of the mineral estate. Justice Vance, in his concurring opinion, states that the terms contained in the "broad form" deeds indicate that the parties contemplated deep-mining only.

All of the mining rights granted in a "broad form" deed are consistent with underground mining, particularly use of timber below a certain circumference for mining purposes (roof support props for underground mining) and where the right to subjacent support is waived and is permitted, as in one of the mineral deeds here (Akers case) where the mineral owner is permitted to pull pillars and cause subsidence of the surface.

I was under the impression that a basic rule of construction of deeds was to gather the intention of the parties from the language of the instrument.

If it is clear from the deed that the parties contemplated underground mining, how can it be said that the deed gives the right to strip mine, which is inferred in *Buchanan* from ownership of the coal?

In all of these cases, timber is expressly reserved except for timber up to a certain size which may be used for mining purposes. *Buchanan* never refers to this express reservation and only one of the broad form deed cases, *Kodak Coal Company v. Smith*, Ky., 338 S.W.2d 699 (1960), mentions the destruction of timber where the issue is brushed off as incident to the right of utilizing the surface.

On the same theme is the ancient right to subjacent support. A historical analysis of the development of this right is contained in Kentucky Law Journal, Vol. 73, beginning on page 439. It is pointed out that the problem of surface subsidence due to underground mining operations arose early in England and quickly developed by case law to an absolute right of support. This rule of law is recognized in *Blue Diamond Coal Company v. Neace*, Ky., 337 S.W.2d 725 (1960), which cited *H.B. Jones Coal Co. v. Mays*, 225 Ky. 365, 8 S.W.2d 626 (1928), and *West Kentucky Coal Co. v. Dilback*, 219 Ky. 783, 294 S.W. 478 (1927). However, *Neace* only referred to this proposition as an issue and made no further reference to it. *West Kentucky* succinctly states the rule in this Commonwealth:

> As we have said, the right to mine is subservient to the right of the surface owners to have the surface maintained in its natural state free from subsidence or partings of the soil, and this right of support is absolute and not dependent upon any question of negligence. But this doctrine ought not to be extended any further than applying it to the surface above the mining operation.

*H.B. Jones*, citing *West Kentucky*, states the same rule as does *North-East Coal Co. v. Hayes*, 244 Ky. 639, 51 S.W.2d 960 (1932), and *Elk Horn Coal Corp. v. Johnson*, Ky., 249 S.W.2d 745 (1952). These last two cases involved "broad form" deeds, as did *H.B. Jones*. These cases are good law today and have never been considered by the "broad form" deed cases. It is a paradox under the same mineral deed to hold that the surface owner on one hand had an absolute right to subjacent support in an underground mining case and, on the other hand, validate the destruction of the surface by strip mining.

*Buchanan* never treats these issues, nor does the majority opinion. I can only assume these two rights are ignored for the reason they cannot be explained away.

I would overrule *Buchanan* in its entirety together with its progeny.

The majority does not specify when the owner of the surface should be paid. I hope it means before strip mining commences.

Another thought occurs to me, and that is this court has spoken at great length about John C.C. Mayo deeds as broad form deeds. Although it is not briefed or argued, I wonder why everyone is assuming the deeds involved here are broad form deeds. They are not Mayo deeds. This seems to be an issue that has not been litigated. Perhaps in the plethora of lawsuits which may be generated by the majority opinion an insight will be given into this question.

The deed from E.C. Halliday, etc., to Robert C. Ream, Trustee, in the Baker case, contains the following language just before the description of the first tract by courses and distances: "But agrees to pay damages to improvements and growing crops."

I would assume this language means what it says that the surface owner can recover for damage to improvements which is the rule expressed in *McIntire*. Improvements should mean all buildings, structures, crops, fencing, orchards, and pastures, i.e., all the land not in a state of nature. Obviously, the trial court can have these damages assessed.

Turning now to the constitutional challenge to the statute, I first point out that the theory that the statute impairs the obligation of a contract is simply not tenable. I have been unable to find a case that holds that a judicial decision interpreting a contract vests such an interest in the contract so as to nullify a statute on the ground of impairment of the obligation of a contract. If a judicial decision accomplished this, then the same court would be similarly bound and powerless to adopt a different construction later. None of the cases cited by the coal companies hold that, and, in particular, *No. 8 Ltd.* does not apply here. The statute involved there purported to be an exercise of police power on the part of the Commonwealth. The simple holding in the opinion is that the Commonwealth may not constitutionally delegate police power to private individuals so that each individual could determine if strip mining should occur on the surface owned by that individual. Thus, the reliance of the majority opinion on *No. 8 Ltd.* is misplaced.

I am intrigued by the approach of the General Assembly in the selection of language in KRS 381.930, et seq.

In particular, I refer to: "(6) To codify a rule of construction for mineral deeds relating to coal extraction so as to implement the intention of the parties at the time the instrument was created; (7) To foster certainty and uniformity in the operation of law."

The rules of construction in KRS 381.940 appear to be another way of saying that the courts should construe the mineral deed in accordance with the intention of the parties.

Reading the mineral deeds here, and the Mayo deeds, can lead but to one conclusion—that the parties contemplated deep mining, not surface mining.

This is recognized in the majority opinion. It does not seem to be all bad that the General Assembly would codify what we have always said and direct that we follow our own rule. In this respect, I am of the opinion the legislation is valid.

I do not understand the concern in the majority about permitting parol evidence to explain the terms of an unambiguous instrument. So far as Eastern Kentucky is concerned, in the area of the Mayo deeds, we take judicial notice that there was no strip mining at the time the deeds were executed. The Mayo deeds have also been construed as unambiguous. I do not know about other areas of Kentucky, including other areas of Eastern Kentucky. After all, it is not settled that *all* mineral deeds contain no ambiguity.

If we take judicial notice that there was no strip mining in the area of the Mayo deeds and they contain no ambiguities, then parol evidence is not indicated.

I am of the further opinion that this court cannot by opinion vest property rights which cannot be changed by subsequent opinion if not already exercised. By the same token, the General Assembly has the constitutional power to do the same.

WINTERSHEIMER, J., joins in this dissent.

LAMBERT, Justice, concurring in part and dissenting in part.

I would uphold the constitutionality of KRS 381.930.945 and overrule this Court's decision in *Buchanan v. Watson*, Ky., 290 S.W.2d 40 (1956). I take this position because of my conviction that at the time the instruments were executed the parties to the so-called "broad form deed" did not contemplate strip mining or any significant damage to the surface of the land.

The typical broad form deed contains extremely broad language in favor of the grantee. Nowhere in the instrument, however, is the mining method identified, and the timber is reserved to the surface owner as is the right to freely use the surface for agricultural purposes. As strip mining was unknown at the time of execution of the instrument and significant surface rights were reserved to the landowner, it is clear that the parties did not contemplate harm to the surface of the land in the course of mineral removal. They clearly expected the minerals to be removed by the only existing methods.

Justice Stephenson accurately observes in his opinion that *Buchanan v. Watson* is "an aberration in the law of minerals. There is absolutely no prior authority for the holding." The advent of equipment capable of moving massive amounts of earth created the potential for dramatic change in the benefits and burdens of the

parties. The *Buchanan* court ignored the state of technology which existed at the time the instruments were executed, and erroneously conferred a right upon the mineral owners which did not exist by virtue of the deed. I agree with the Supreme Court of Tennessee as its view is expressed in *Doochin v. Rackley,* 610 S.W.2d 715, 719 (Tenn.1981):

> Strip mining cannot be presumed to have been within the contemplation of the parties. Consequently, no right to strip mine accompanied ownership of the mineral rights. Nor is there any evidence that the parties intended a contrary result.

While I disagree with much contained in the majority opinion, surely one portion of it is correct: "It is clear that Kentucky is standing naked and alone in the view under *Buchanan*." The states of Ohio, Virginia, West Virginia, Pennsylvania, Tennessee, Colorado, and Texas * have all expressed the view that since strip mining is incompatible with the enjoyment of the surface estate, the right to remove minerals does not carry with it the right to destroy the surface unless the contrary intention affirmatively appears in the instrument. In *Skivolocki v. East Ohio Gas Company,* 38 Ohio St.2d 244, 313 N.E.2d 374 (1974), the Ohio Supreme Court adopted the Pennsylvania view as expressed in *Stewart v. Chernicky,* 439 Pa. 43, 266 A.2d 259, 263 (Pa.1970) quoting *Wilkes-Barre Twp. School District v. Corgan,* 403 Pa. 383, 386, 170 A.2d 97, 98 (1961) as follows:

> Where the language of a contract is contradictory, obscure, or ambiguous, or where its meaning is doubtful, so that it is susceptible of two constructions, one of which makes it fair, customary, and such as prudent men would naturally execute *while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes a ra-*

---

* *Franklin v. Callicoat,* 119 N.E.2d 688 (Ohio 1954); *Phipps v. Leftwich,* 216 Va. 706, 222 S.E.2d 536 (Va.1976); *West Virginia-Pittsburg Coal Co. v. Strong,* 129 W.Va. 832, 42 S.E.2d 46 (1947); *Stewart v. Chernicky,* 439 Pa. 43, 266 A.2d 259 (1970); *Doochin v. Rackley,* 610 S.W.2d 715 (Tenn.1981); *Smith v. Moore,* 172 Colo. 440, 474 P.2d 794 (1970); and *DuBois v. Jacobs,* 551 S.W.2d 147 (Tex.1977).

*tional and probable agreement must be preferred.*

While I concur with that portion of the majority opinion which allows the surface owner to recover damages, taken as a whole, the majority opinion does little to remedy the harm caused by *Buchanan.*

KRS 381.930–.945 is almost identical to the Tennessee statute addressed in *Doochin v. Rackley, supra.* The court in *Doochin* sufficiently answered the constitutional challenge to the statute, and its reasoning is persuasive. To the extent that some may argue reliance upon prior decisions of this Court as protection from change, it should be noted that:

> There is no vested right in the decisions of a court, and a change of decisions of a state court does not constitute the passing of a law (in contravention of the United States Constitution, Article I, Sec. 10), although the effect of such change is to impair the validity of a contract made in reliance on prior decisions.

16A Am.Jur.2d *Constitutional Law* § 703 (1979).

The Contract Clause, Article I, Sec. 10, of the United States Constitution, and Sec. 19 of the Kentucky Constitution protect only those rights which are embraced in the contract of the parties at the time the contract is entered into. The subsequent occurrence of unforeseen advantage is not entitled to constitutional protection. As the Supreme Court said in *El Paso v. Simmons,* 379 U.S. 497, 515, 85 S.Ct. 577, 587, 13 L.Ed.2d 446 (1964):

> These developments (the discovery of mineral wealth) hardly to be expected or foreseen, operated to confer considerable advantages on the purchaser and his successors and a costly and difficult burden on the State. *This Court's decisions have never given a law which imposes unforeseen advantages or burdens on a contracting party constitutional immunity against change.* (Citations omitted.) Laws which restrict a party to those gains reasonably to be expected from the contract are not subject to attack under the Contract Clause, notwithstanding that they technically alter an

obligation of a contract. (Emphasis added.)

With the enactment of KRS 381.930–.945, the General Assembly did no more than codify a rule of construction designed to give effect to the intention of the parties. I do not regard this as an attack upon the Constitution of Kentucky and see no reason to declare it unconstitutional.