**COLUMBIA GAS TRANSMISSION CORPORATION, Plaintiff,**

v.

**LIMITED CORPORATION, Defendant.**

**Civ. A. No. 89–23.**

United States District Court, E.D. Kentucky, Pikeville.

Oct. 1, 1990.

John A. West and Danny C. Reeves, Greenbaum, Doll & McDonald, Lexington, Ky., and Harry C. Bruner, Jr., Charleston, W.Va., for plaintiff.

Will T. Scott, Stratton, May & Hays, Pikeville, Ky., for defendant.

## MEMORANDUM OPINION AND ORDER

HOOD, District Judge.

This diversity action is before the Court on cross-motions for summary judgment under Rule 56, Fed.R.Civ.P. [Record Nos. 41 and 55]. Fully briefed and argued, the matter is ripe for decision.

## I. INTRODUCTION

This case presents three issues for the Court's consideration. First, is the plaintiff Columbia Gas Transmission Corporation [TCO] entitled to recover compensatory damages for damage to its natural gas pipelines caused by the defendant Limited Corporation [Limited] and its agents? Second, is Limited responsible for the costs incurred in upgrading and installing road crossings and relocating portions to TCO's existing pipelines encountered by defendants in the course of their mining operations? Third, is Limited responsible for the

cost of relocating existing pipelines that are currently located in areas to be mined by Limited? Based upon the deposition testimony taken in this action, Limited's responses to requests for admissions, and the affidavits submitted by TCO, there are no genuine issues of material fact which prevent the Court from adjudicating these questions. For the reasons discussed below, TCO is entitled to judgment as a matter of law on these issues.

## II. PROCEDURAL HISTORY

TCO instituted this action against defendants Limited and Bruin Trucking Company [Bruin] seeking injunctive relief and compensatory damages arising out of the defendants' interference with and damage to a number of TCO's natural gas pipelines located in Pike County, Kentucky.[1] On January 17, 1989, the Court, per Judge Forester, granted TCO's request for a temporary restraining order enjoining the complained of activities of the defendants. Thereafter, on January 20, 1989, the Court, again per Judge Forester, entered an agreed preliminary injunction which continued the injunctive relief set out in the temporary restraining order.

In conjunction with the agreed preliminary injunction, the parties also entered into an agreement which had the effect of accommodating the rights asserted by the respective parties. [See Record No. 42, Exhibit A]. Pursuant to the terms of this agreement, the defendants paid $69,000 to TCO which represented the anticipated costs and expenses to be incurred in installing road crossings and related construction activities to protect TCO's pipelines from further damage and to avert the dangerous situation created by the defendants' mining activities.

On November 1, 1989, Limited moved the Court for leave to assert a counterclaim against TCO. This motion was sustained and Limited's counterclaim was filed November 28, 1989. By this counterclaim,

Limited seeks to recover the $69,000 paid to TCO under the above-referenced agreement. Limited asserts that, pursuant to the terms of an indenture of lease entered into between the parties' predecessors-in-title, TCO should be required to repay this sum to Limited.

On or about March 1, 1990, Limited moved the Court for leave to amend its counterclaim to assert an additional claim for declaratory relief. On March 28, 1990, the Court sustained this motion and directed that the amended counterclaim be filed.

## III. STATEMENT OF FACTS

1. TCO engaged in the production, purchase, underground storage, transportation and sale of natural gas in interstate commerce in Kentucky and other states. As part of the operation of an interstate gas pipeline system, TCO owns and operates several natural gas pipelines and producing natural gas wells which are located near the community of Phelps in Pike County, Kentucky. [Complaint, ¶¶ 1, 8, 9 and 10; Answer, ¶¶ 1, 2].

2. TCO's rights in the real property which is involved in this action emanate from an indenture of lease dated July 24, 1930 [the Kentland lease or lease] and entered into between Kentland Coal & Coke Company [Kentland] and Howe Oil and Gas Company [Howe]. [See Record No. 42, Exhibit B]. Under the lease, Kentland leased to Howe, TCO's predecessor, all the oil and gas underlying approximately 65,299 acres of land located in Pike County, Kentucky and Buchanan County, Virginia. [Complaint, ¶ 11; Answer, ¶ 2].

3. As successors-in-interest to Howe, TCO acquired "the right to lay pipelines ... and such other necessary rights for the efficient operation of the demised property for oil, gas and gasoline...." In connection with these rights, TCO maintains a surface right-of-way above the pipelines

---

**1.** As set forth more fully below, Bruin was employed as a contract miner by Limited and acted in accordance with instructions from Limited. [Limited's Response No. 2 to TCO's Requests for Admissions]. TCO and Limited have agreed that Limited is responsible for the actions of Bruin and that Bruin is no longer a necessary party and may be dismissed from this action. [Record No. 29].

and around the wells. [Complaint, ¶¶ 13, 14].

4. Limited is engaged in the business of mining coal by strip mine and mountain top removal methods. Limited conducts its mining activities through contract miners. [1/19/90 Swiger depo., p. 9]. Limited asserts that, through various assignments, it acquired the coal mining rights in the property covered by the Kentland lease.

5. Limited's mining operations and the above-referenced pipelines of TCO are located within the area covered by the Kentland lease. [Complaint, ¶ 11; Answer, ¶ 2]. The specific locations of the pipelines in issue are identified on the map attached as Exhibit 2 to the deposition of Herbert Swiger, the General Superintendent of Limited. [1/19/90 Swiger depo., p. 14].

6. The three pipelines involved in this litigation were originally constructed in 1960. These pipelines are designated as p–84, PW–8765 and PW–8887. At the time defendants commenced their mining activities on the subject property, TCO's pipelines had been in place for approximately 29 years. [3/30/90 Hall Affidavit, ¶ 2 [2]; 1/19/90 Swiger depo., p. 21].

7. PW–8765 is located both above and below the surface and connects natural gas flow from Well 8765 to Line P–84. [Complaint, ¶ 9]. The defendants' encroachment on TCO's leasehold rights concerning PW–8765 was first discovered on or about December 9, 1988 by A.T. Hall, an Operations Supervisor for TCO. Prior to this time, TCO was unaware of the defendants' mining activities on the subject property. [3/30/90 Hall Affidavit, ¶ 3].

8. On December 9, Mr. Hall observed that Bruin, Limited's contract miner, had caused several large boulders to lodge against PW–8765 in an area running parallel to Bruin's coal haul road. The area involved is more particularly described in Attachment 1 to the 3/30/90 Hall Affidavit. [1/17/89 Hall Affidavit, ¶ 2; 1/19/90 Hall depo., pp. 20–21]. In addition to dumping debris against this pipeline, Limit-

ed also crossed the pipeline in the course of its mining activities. [1/19/90 Swiger depo., p. 34; 3/30/90 Hall Affidavit, Attachment 2].

9. With respect to PW–8765, Limited has admitted that the defendants "caused mining debris to be pushed against portions of ... [PW–8765] located above the surface of the area being mined and parallel to the coal haul road being utilized by Limited Corp. and/or Bruin...." and that "[t]his activity occurred within the area subject to the Kentland lease." Limited has also admitted that, "[o]n or before December 9, 1988, ... [it] crossed portions of ... [PW–8765 which were] located in an area subject to the Kentland lease." [Answers to Request for Admissions to the Defendant Limited Corporation, Response No. 11 and 14].

10. Upon discovering the defendants' encroachment, Mr. Hall informed Mr. Swiger that the debris placed against PW–8765 created an immediate risk of damage to the pipeline and a danger to persons utilizing the coal haul road in the vicinity of the pipeline. [1/17/89 Hall affidavit, ¶¶ 2, 3]. With respect to the portion of PW–8765 that crossed beneath a coal haul road utilized by Limited and Bruin, Mr. Hall informed Mr. Swiger that defendants' use of this road crossing created an immediate danger and should not be used until such time as the crossing had been inspected and reinforced. [1/17/89 Hall Affidavit, ¶ 4].

11. Although not apparent at the time of the December 9 inspection, Mr. Hall was also informed by Mr. Swiger that Bruin and Limited intended to create a hollow fill in the area occupied by a portion of PW–8765 and that, in creating this hollow fill, blasting activities would be undertaken in close proximity to PW–8765 and Well 8791. Despite Hall's warning and directions, the defendants continued to encroach upon TCO leasehold interest after the December 9, 1988 inspection, as evidenced by the sub-

---

**2.** The March 30, 1990 affidavit of Mr. Hall is attached as Exhibit C. As discussed more fully below, this affidavit described the areas of inter-

ference as well as the actions taken to accommodate the rights of the parties.

sequent damage to PW–8765 and PW–8887. [1/17/89 Hall Affidavit, ¶ 8].

12. P–84 is an 8″ pipeline that transports natural gas from a number of wells and gathering lines, including PW–8765 and PW–8887. Subsequent to Mr. Hall's inspection of PW–8765, Hall inspected P–84 with respect to the defendants' mining operations near that pipeline. During this inspection, Mr. Hall observed that the defendants had encroached upon TCO's leasehold interest with respect to this line by constructing a coal haul road and retaining bench. Through these activities, approximately 25 feet of overburden was placed about a portion of P–84. As a result, TCO was unable to inspect or repair the pipeline. [1/17/89 Hall Affidavit, ¶¶ 10, 11].[3]

13. Limited has admitted that, "[p]rior to December 13, 1988, Limited Corp. and/or Bruin Trucking Company caused to be constructed a coal haul road which crossed portions of TCO's natural gas pipeline designated P–84 and located in an area subject to the Kentland lease...." and that "[p]rior to December 13, 1988, and for some period thereafter, Limited Corp. and/or Bruin Trucking Company crossed portions of TCO's natural gas pipeline, designated P–84, with heavy diesel equipment used in its mining operations." [Answers to Request for Admissions to Defendant Limited Corporation, Response No. 5 and 10].

14. TCO's pipeline PW–8887 was also constructed in 1960. [3/30/90 Hall Affidavit, ¶ 2]. This pipeline is located below the surface and connects natural gas flow from well 8887 to line P–84. On or about January 12, 1989, Mr. Hall again inspected the defendants' mining operations as those operations affected TCO's pipelines and wells. During this inspection, Mr. Hall observed the defendants utilizing an existing roadway which crossed PW–8887. Based on these observations, it appeared that the defendants intended to increase the size of this roadway to accommodate heavy mining equipment and large coal trucks which

would create a dangerous condition and potential damage of the type described in paragraph 10 above. [1/17/89 Hall Affidavit, ¶¶ 14–17].

15. On January 16, 1989, while scraping the roadway with a bulldozer or road grader, Bruin struck PW–8887 causing two cracks in the line. The value of natural gas lost from this incident and the cost to repair the damage to the pipeline totals $930.20. [3/30/90 Hall Affidavit, ¶ 4]. Through Mr. Swiger, Limited's authorized representative, Limited acknowledges encroaching upon this pipeline in the course of its mining activities. [Complaint, ¶ 10; 1/19/90 Swiger depo., p. 26].

16. On January 17, 1989, due to the debris dumped against PW–8765 by the defendants, this pipeline separated from Well 8791 causing a loss of natural gas and damage to the pipeline in the amount of $3,785.31. [3/30/90 Hall affidavit, ¶ 3].

17. This action was filed January 17, 1989. TCO's complaint seeks compensatory damages resulting from the defendants' unlawful interference with its pipelines and wells and injunctive relief to prevent further interference. Following the entry of a temporary restraining order, the Court entered an agreed preliminary injunction on January 20, 1989 which enjoins the defendants from:

(i) causing additional debris or overburden to be placed against Line PW–8765, situated parallel to the defendants' coal haul road;

(ii) moving heavy diesel equipment across TCO's right-of-way related to Line PW–8765 running under defendants' coal haul road until such time as adequate road crossings were constructed and approved by TCO;

(iii) covering Line PW–8765 with debris and overburden from defendants' coal mining activities;

(iv) conducting blasting activities within 500 feet of Line PW–8765 or TCO Gas Well 8791 unless prior approval was obtained from TCO;

---

**3.** Although Limited disputes the depth of material placed over P–84, it does not dispute the fact that it was responsible for placing fill material above the pipeline. [1/19/90 Swiger depo., p. 36].

(v) moving heavy diesel equipment across TCO's right-of-way related to Line P–84 running under defendants' coal haul road until such time as adequate road crossings were constructed and approved by TCO;

(vi) conducting mining activities near P–84 that might endanger the pipeline;

(vii) constructing additional roads that cross TCO's right-of-way with respect to P–84 until adequate road crossings were constructed and approved by TCO;

(viii) moving heavy diesel equipment across TCO's right-of-way with respect to Line PW–8777 until such time as adequate road crossings were constructed and approved by TCO;

(ix) upgrading or enlarging those portions of the defendants' proposed coal haul road that crossed TCO's right-of-way with respect to Line PW–8887 until such activity was approved in writing by TCO.

18. On January 19, 1989, Limited, Bruin and TCO entered into an agreement which allowed the defendants to continue to conduct coal mining operations in the immediate area of TCO's pipelines and wells, but in such a manner as to prevent damage to TCO's pipelines and wells as well as to ensure the safety of the defendants' employees. This agreement further provided, in pertinent part, that:

2. *Accommodation of Coal Mining Activities.* TCO agrees to assist Limited and Bruin to construct adequate temporary road crossings above those portions of TCO's natural gas pipelines, which are designated as Line P–84 and Line PW–8765, across which Limited's and Bruin's coal haul road is located. TCO further agrees to either assist Limited and Bruin in constructing adequate temporary road crossings above those portions of TCO's natural gas pipeline, which is designated as Line PW–8887, across which runs Limited's and Bruin's coal haul road, or TCO agrees to retain a contractor to relocate that portion of Line PW–8887, across which runs Limited's and Bruin's coal haul road. . . .

3. *Funding of Construction and Relocation.* Limited and Bruin agree to pay TCO *$69,000.* as a deposit to be attributed to the construction costs and relocation costs that TCO will incur in order to safeguard its natural gas pipe lines from the coal mining activities being conducted by Limited and Bruin. The deposit shall also be attributed to the expenses incurred by TCO as a result of constructing the temporary road crossings described in paragraph 2, above.

\* \* \* \* \* \*

6. *Future Mining Operations.* Limited and Bruin agree to give written notice to TCO before conducting future mining operations that may impact upon TCO's natural gas pipelines or natural gas wells. Limited and Bruin agree to obtain written authorization from TCO prior to constructing any further roads that cross through any of TCO's right-of-ways with respect to any of TCO's natural gas pipelines. Finally, Limited and Bruin agree not to conduct blasting activities within 125 feet of any of TCO's natural gas pipelines or natural gas wells, without express written authorization from TCO.

[Record No. 42, Exhibit A].

19. A check in the sum of $69,000 was subsequently forwarded to TCO. Pursuant to the parties' agreement, a portion of pipeline P–84 was reconstructed to allow safe crossing by the defendants' heavy mining equipment. A more detailed description of the area involved is set forth on Attachment 6 and 7 to the 3/30/90 Hall Affidavit. The cost of this work totals $10,172.34. Further, in addition to the repair work set forth above, portions of PW–8765 were relocated and road crossings installed to accomodate the defendants' mining activities. The areas of PW–8765 affected are more accurately described by Attachments 2 and 8 to the 3/30/90 Hall Affidavit. The cost of the work associated with PW–8765, exclusive of the damage to the pipeline described above, is $9,871.48.

20. After the agreement was executed, Limited requested that, in lieu of installing road crossings across portions of PW–8887, a portion of this pipeline be relocated in an

area further away from the defendants' mining activities. TCO complied with this request. The area of PW–8887 involved in this relocation is more accurately described by Attachments 4 and 5 to the 3/30/90 Hall Affidavit. [3/30/90 Hall Affidavit, ¶ 5]. The cost of this relocation totals $18,351.31.

21. Although all pipeline relocations has not been completed, actual expenses have been incurred with respect to the following pipelines in the following amounts:

| Pipeline No. | Actual Cost |
|---|---|
| P–84 | $10,172.43 |
| PW–8887 (damage) | 930.20 |
| PW–8765 (damage) | 3,785.31 |
| PW–8887 | 18,351.52 |
| PW–8765 [4] | 9,871.48 |
| **Total Costs Incurred to Date:** | **$43,110.85** |

22. Based upon the actual costs incurred to date as well as the costs expected to be incurred in relocating the remaining section of PW–8765 after the mountain top removal is completed, Limited may be entitled to a refund of a portion of the sum deposited with TCO. Whether such a refund will be due cannot be determined at the present time.

23. Through the counterclaim filed herein, Limited seeks to recover the full amount paid to TCO pursuant to the agreement. Limited asserts that it is entitled to recover this sum because, "[the Kentland] lease designates the coal underlying the described property as the dominant estate; the oil and gas estates as the subservient thereto, and further provides, that upon six months notice in writing, the [TCO] ... is required to remove and/or relocate its structures and/or 'pipelines' at its expense."

24. In addition to its attempt to recover the amount paid to TCO pursuant to the parties 1/19/89 agreement, by its amended counterclaim, Limited seeks a declaratory judgment requiring TCO to relocate additional portions of P–84 at TCO's expense. Although this claim was asserted after the discovery deadline imposed by the Court, the issue raised by the amended counter-

claim shall be resolved in TCO's favor as a matter of law.

25. Although the Kentland lease designates the coal underlying the subject property as the "dominant estate" and the oil and gas estate as "subservient thereto", the lease *does not* require the lessee, *i.e.*, TCO, "to remove and/or relocate its structures and/or pipelines" at TCO's expense, as Limited claims [Record No. 42, Exhibit B].

26. With respect to the claims asserted in TCO's complaint and Limited's original counterclaim, there is no dispute that, prior to the December discussions between Mr. Hall and Mr. Swiger, no notification was given to TCO by Limited that it would be necessary that TCO's pipelines be moved to accommodate Limited's mining activity on the property. [1/19/90 Swiger depo., p. 23; Answers to Request for Admissions to Defendant Limited Corporation, Response No. 23].

## IV. DISCUSSION

### A. *The Legal Standard for Granting Summary Judgment*

The so-called "new era" of summary judgments was discussed in depth in *Street v. J.C. Bradford and Company*, 886 F.2d 1472, 1479–80 (6th Cir.1989). *See also Darnell v. Campbell County Fiscal Court*, 731 F.Supp. 1309, 1311–12 (E.D.Ky. 1990). For the sake of brevity the characteristics of the "new era" need not be recounted here. Rather, it is sufficient to simply note that summary judgment is appropriate here.

### B. *Limited is Responsible for Damages to TCO's Pipelines And For The Costs of Relocating TCO's Pipelines*

The costs, expenses and damages resulting from Limited's mining activities fall into three categories: (i) loss of natural gas and cost of repair of actual physical dam-

---

**4.** The relocation of approximately 1,000 feet of PW–8765 cannot be performed until Limited completes its mountain top removal project. The projected cost of this additional relocation is $12,200. Attachment 2 to the 3/30/90 Hall Affidavit reflects the area of PW–8765 that will be affected by the mountain top removal.

age done to TCO's pipelines; (ii) costs of relocating portions of certain pipelines and installing road crossings to prevent further damage to the pipelines, not to mention the need to alleviate the dangerous condition to the defendants' employees created by Limited's mining activities; and (iii) future costs of relocating a portion of pipeline PW–8765 in order to avoid interference with the future mining activities of Limited. As demonstrated herein, TCO is entitled to judgment as a matter of law as to each of the above-described types of costs.

1. Damage to Pipelines

TCO seeks to recover compensatory damages in the amount of $4,715.51, representing the cost to repair PW–8765 and PW–8887 and the value of natural gas lost from these pipelines resulting from the defendants' encroachments on these lines. With respect to this claim, there can be no dispute that, pursuant to the terms of the Kentland lease, TCO has the right to lay and operate these pipelines. Further, there can be no dispute that, despite being warned not to cross TCO's pipelines with heavy mining equipment or place debris or other materials against or above the pipelines, the defendants failed and refused to heed TCO warnings, resulting in damage to the lines on January 16 and January 17, 1989.

 Under Kentucky law, the owner of the dominant estate and the owner of the subservient estate enjoy correlative rights to use the property covered by their respective easements. *Central Kentucky Natural Gas Co. v. Huls*, 241 S.W.2d 986 (Ky.1951). The owners must have due regard for each other and should exercise that degree of care and use which a just consideration for the rights of the other demands. *Jenkins v. Depoyster*, 299 Ky. 500, 186 S.W.2d 14 (1945). This well-recognized obligation includes, at a minimum, the duty to exercise reasonable care to avoid interference with the proper exercise of the reserved rights of the subservient

estate owner who is employing his estate in an authorized and reasonable manner. *Wells v. North East Coal Co.*, 274 Ky. 268, 118 S.W.2d 555 (1938). This obligation has been codified in KRS § 353.500. This statutory section provides:

It is hereby declared to be the public policy of this Commonwealth to foster conservation of all mineral resources, to encourage exploration for such resources, *to protect correlative rights of land and mineral owners*, to prohibit waste and unnecessary surface loss and damage and to encourage the maximum recovery of oil and gas from all deposits thereof now known and which may hereafter be discovered; and *to promote safety in the operation thereof.* To that end, KRS 353.500 to 353.729 is enacted and shall be liberally construed to give effect to such public policy. (emphasis added).

 In this case, Limited did not employ its estate in a reasonable manner to avoid interference with the proper use of TCO's subservient estate. Instead, Limited conducted its mining operations in such a way as to do physical damage to TCO's property, which damage could have been avoided with the use of reasonable care by Limited. This is a simple case of trespass and under such circumstances, TCO is entitled to recover its damages. *Hughett v. Caldwell County*, 313 Ky. 85, 230 S.W.2d 92, 96 (1950) ("a trespasser is responsible for all injurious consequences flowing from his trespass which are the natural and proximate result of his conduct.")

2. Limited is Responsible For The Costs of Relocation of Pipelines to Avoid Interference with Mining Activities.

 With respect to the costs incurred in installing road crossings and relocating pipelines to accommodate the parties' respective rights in the subject property as well as the costs to be incurred in the future to relocate portions of PW–8765 and/or P–84,[5] applicable Kentucky authori-

---

5. As set forth above, the costs incurred in installing road crossings and relocating certain parts of PW–8765 and PW–8887 so that Limited

could continue its mining operations without interfering with TCO pipelines *totals $38,395.34.* Additional costs will be incurred with respect to

ty establishes that Limited must pay these costs. Limited's counterclaim asserts that, because the Kentland lease characterizes the coal estate as dominant and the oil and gas subservient, TCO is obligated to move its pipeline at its own expense in order to avoid interference with Limited's surface mining operations. Limited's position is not supported by the lease or by the law.

It seems, both from the language of the lease itself and the historical context in which it was executed, that the parties did not contemplate the extraction of coal from the subject property by surface mining methods. The Kentland lease was executed on July 24, 1930. According to the official records of Kentucky's Department of Mines and Minerals, surface or strip mining was not utilized for extracting coal in Pike County, Kentucky at the time of the execution of the lease. [See Record No. 42, Exhibit D]. In fact, a review of these records indicates that no surface mining occurred in Pike County until 1944.

The language of the lease also suggests that the parties contemplated that the coal would be removed by underground mining methods only. Section "Eighth", for example, provides that the lessee shall, when requested to do so by the lessor, bury all pipelines beyond plowing depth. It seems that, had the parties contemplated that the property would be surfaced mined, it would not have been necessary to require that the lines be buried beyond plow depth, since surface mining operations would have extended far below that level. Similarly, Section "Fourteenth" refers to "entry, haulway or air course," all terms relating exclusively to deep mining operations.

Based on the absence of surface mining in Pike County in 1930 and the language of the Kentland lease, the Court could conclude that the original parties to the lease did not contemplate that the oil and gas estate would be subjected to the extensive interference caused by surface mining operations. Thus, Limited would be liable to TCO for the damages to its estate.

This reasoning was adopted by the Supreme Court in *Wiser Oil Co. v. Conley*, the relocation of P–84 and additional sections of

346 S.W.2d 718 (Ky.1960), involving an oil and gas lease executed in 1917. In the early 1960's, the original lessee's successor began using a new technique called "water flooding," which literally flushed out oil beneath the surface estate, causing much damage to the surface. Although this process was not unknown when the original lease was executed, it was not then in general use. The surface owner sued for damages to his estate. Although upholding the lessee's right to use the new technique, the Court held that:

> ... where, as here, there is no express release of damages and a new method of withdrawing oil is employed, which was not in the minds of the parties at the time the lease was executed and which will destroy or substantially damage the landowner's remaining estate, principles of justice and humanity require that reasonable compensation be paid the landowner for the destruction wrought,

*Id.* at 721.

Pursuant to the parties' agreement, TCO relocated portions of PW–8765, PW–887, installed road crossings and upgraded other crossings in order to accommodate Limited's strip mining activities and avoid further damage to or destruction of the pipelines by these mining activities. Under the Holding of *Wiser Oil*, TCO argues that Limited is responsible for paying these costs. Although attractive, the Court finds it unnecessary to reach the conclusion advanced by TCO.

A fair reading of the lease under Kentucky law leads to the conclusion that it requires TCO to move its pipelines to avoid interference with Limited's efforts to remove the coal. However, as the lease is silent on the question as to who must pay the costs of pipeline relocation, the Court must look to Kentucky case authority for the answer to this question.

In *McIntire v. Marian Coal Co.*, 190 Ky. 342, 227 S.W. 298 (1921), Marian Coal Co. held title to the coal by what is known as a "broad form deed," meaning that the granting clause of the deed spelled out in the broadest possible terms the rights of PW–8765.

the coal owner to use the surface for all necessary and convenient purposes. In upholding the rights of the coal owner to make extensive use of the surface, the court stated:

> Undoubtedly, under the plain terms of the deed, the Marian Coal Co. has the right and could, by showing the necessity or convenience thereof, use and occupy the whole surface of the land in question even to excluding the plaintiff and taking his house and garden, *but such taking would have to be after satisfaction or adjudged compensation for such improvements*, which is but another way of saying that the mineral estate under the deed is dominant, superior and exclusive in every circumstance or condition where the owner thereof shall deed it necessary or convenient to make such use of the surface as the deed allows.

*Id.*, 227 S.W. at 309. (emphasis added).

The recent case of *Akers v. Baldwin*, 736 S.W.2d 294 (Ky.1987), adopted the same rationale in changing the direction of a long line of cases dealing with the respective rights of mineral owners and surface owners under broad form deeds. In the course of an exhaustive review of the many prior decisions dealing with the respective rights of surface and mineral owners, the Kentucky Supreme Court had this to say about the *Marian Coal Co.* decision:

> This Court thus declared the owner of the minerals to be the "dominant" estate and allowed the mineral owner to use the surface, even in the face of a reservation on behalf of the surface owner. Significantly, however, and too often ignored by many of our later cases, is the fact we provided for an award of damages to the injured surface owner.

*Id.* at 299.

The *Akers* decision goes on to discuss *Buchanan v. Watson*, 290 S.W.2d 40 (Ky. 1956), and its progeny, which confirmed the dominance of the mineral estate and the mineral owner's authority under a broad form deed to make such use of the surface as deemed by the mineral owner to be necessary or convenient without liability for damages to the surface (absent oppressive, arbitrary, wanton or malicious conduct by the mineral owner). The court then overruled *Buchanan* to the extent it denied damages to the owner of the surface of the land, even if the severance instrument contains a waiver of damages provision.

■ The *Akers* case is dispositive of the issue here. It supports the proposition that the owner of the dominant estate may in fact make such use of the other estates, including surface or other servient mineral estates, as specified in the severance document, but to the extent such use results in damage to the other estates, the dominant owner is liable for such damages.

It is significant that the *Akers* court held the dominant estate owner liable for damages to the subservient estate even though the mineral severance deed in that case contained a waiver of damages clause. Since the Kentland lease contained no such waiver clause, TCO's claim for damages is even stronger than the claim of the *Akers* plaintiffs. Furthermore, the lease grants to TCO specific rights, including the right to lay pipelines, which, again, places TCO in an even stronger position than the *Akers* plaintiffs, since they were not relying on specific grants of authority in their instruments of title.

Thus, based on the decision in *Akers*, it must be concluded as a matter of law that TCO is entitled to recover damages for injury to its leasehold estate by virtue of Limited's use of the surface in the course of its mining operations. Under the circumstances presented here, that damage takes the form of relocation costs and related expenses incurred to accommodate the respective rights of the parties.

## V. CONCLUSION

For the reasons set out above, it is concluded that TCO is entitled to summary judgment against the defendants on all issues raised in this action. Entry of final judgment is reserved until the final cost of

 

the relocation of the affected pipelines is ascertained.

IT IS SO ORDERED.