KARST–ROBBINS COAL COMPANY, INC.; Brenda Faye Coal Sales Company, Inc; Edward W. Karst; Brenda Faye Karst; and Aletha Karst, Appellants/Cross–Appellees,

v.

ARCH OF KENTUCKY, INC.; and Ark Land Company, Appellees/Cross–Appellants.

Nos. 95–CA–3445–MR, 95–CA–3446–MR.

Court of Appeals of Kentucky.

Nov. 14, 1997.

Discretionary Review Denied by Supreme Court May 13, 1998.

James R. Cox, Reed, Weitkamp, Schell, Cox & Vice, Louisville, for Appellants/Cross–Appellees.

Richard C. Ward, Jeff A. Woods, Penny R. Warren, Wyatt, Tarrant & Combs, Lexington, for Appellees/Cross–Appellants.

Before GUDGEL, KNOPF and SCHRODER, JJ.

## OPINION

GUDGEL, Judge.

This is an appeal and cross appeal from a judgment entered by the Harlan Circuit Court in a tort action for damages stemming from certain coal mining operations. Appellants/cross-appellees Karst–Robbins Coal Company, Inc., Brenda Faye Coal Sales Company, Inc., Edward W. Karst, Brenda Faye Karst and Aletha Karst (hereinafter collectively referred to as Karst) contend that the trial court erred (1) by finding that a clause in a 1926 deed absolved appellees/cross-appellants Arch of Kentucky, Inc. and Ark Land Company (hereinafter collectively referred to as Arch) from liability for damages stemming from certain underground coal mining operations, (2) by directing a verdict as to Karst's claim that Arch conducted its mining operations in an arbitrary, wanton, malicious, or grossly negligent manner, (3) by failing to permit a jury to determine whether Arch conducted its mining operations in an oppressive manner, (4) by directing a verdict as to Karst's claim for punitive damages, (5) by submitting Karst's equipment damage claim under a comparative negligence standard, and (6) by failing to allow Karst to establish its damages claim for lost coal through certain nontraditional methods. On cross appeal, Arch contends that the court erred by submitting Karst's equipment damage claim to the jury. We disagree with all of Karst's contentions on direct appeal, but we agree with Arch's contention on cross appeal. Hence, we affirm as to the direct appeal, and reverse and remand as to the cross appeal.

This action principally concerns the parties' rights and liabilities under the provisions of a particular deed. Specifically, a deed was executed on December 18, 1926, by Arch's predecessor in title, United States Coal and Coke Company (a subsidiary of U.S. Steel Corporation, hereinafter referred to as U.S. Steel), in favor of Karst's predecessor in title, Harlan Splint Land Company. The deed conveyed to Harlan Splint approximately 1,720 acres of land and the coal located thereunder in the "Harlan seam." The deed included the following exception:

[T]here is hereby expressly reserved to the party of the first part, its successors and assigns, and not conveyed by it, all the coal and every vein and seam thereof; lying below water level of Clover Fork of Cumberland River, located in, on and under the hereinabove described boundary, together with all the usual mining privileges necessary or conveniant [sic] for the party of the first part to have in the mining of said reserved coal ... with the right in said party of the first part to enter upon said lands to drill and operate and mine said coal so reserved as aforesaid, together with the right to enter upon said lands, use and operate the same and the surface thereof

and to make use of and divert water courses thereon in any and every manner that may be deemed necessary or convenient for the mining or removing therefrom or otherwise utilizing said coal so reserved as aforesaid, and for the transportation therefrom of coal mined from said coal so reserved, and to transport and convey through the lands hereby conveyed any coal mined from said veins or seams so reserved ... *also the right to remove coal from said seams so reserved without leaving any support for the overlying strata and without liability for injury or damage which may result from the breaking of said strata, and the right to deposit coal, slate, and other refuse upon the surface of said lands hereby conveyed in the mining of said coal so reserved.* (Emphasis added.)

. . . .

It is distinctly agreed that the foregoing rights and immunities reserved by and vested in, the party of the first part, and its assigns, are subject to the limitation that during the period party of the second part or its assigns shall be operating the coal not reserved, such rights and immunities shall not be exercised in such manner as to interfere with surface improvements of the party of the second part or its assigns, except by subsidence, if same shall be caused by mining operations but after such operations shall have been finally concluded, such rights and immunities shall be no longer subject to the foregoing limitation.

Harlan Splint subsequently entered into certain leases affecting the coal acquired pursuant to the 1926 deed, and the lessee and its successor conducted mining operations on the property until 1958. In 1974, Karst purchased Harlan Splint's property rights to the remaining coal and the surface, and it conducted additional mining operations until 1990.

Meanwhile, prior to 1974, U.S. Steel opened its mine No. 37 and began underground mining operations in the Harlan seam on property located adjacent to that purchased by Karst. After these mine entries "squeezed" out, experts recommended that further mining should be conducted by utilizing modern longwall mining techniques. By 1982, longwall mining equipment was purchased and installed, and mining operations resumed. In 1984, Arch purchased U.S. Steel's interests in the properties and operations, including the coal reserved in the 1926 deed beneath the Karst property. Due to certain geological problems, Arch was forced to mine toward the Karst property more quickly than was originally planned and, instead of reaching that property in 1991, Arch commenced longwall mining operations under it in December 1987. Those operations were completed by 1991.

Karst subsequently filed a tort action against Arch, seeking compensatory and punitive damages stemming from the fact that Arch's mining activities beneath the Karst property not only rendered the remaining Karst coal inaccessible and unminable, but also destroyed certain mining equipment. A jury trial on the merits was conducted in 1993, by which time the court had ruled that Arch had a right to utilize modern longwall mining techniques under the Karst property, and that any claims for damages to other coal seams and the surface were expressly waived by the 1926 deed. Thus, the only issue before the jury was whether Arch had conducted its mining operations in an arbitrary, wanton, malicious, or grossly negligent manner. At the conclusion of the trial, the court directed a verdict in favor of Arch as to Karst's claim for lost coal, but it submitted Karst's claim for destroyed equipment to the jury under a comparative negligence instruction. The jury found that Arch was fifty percent at fault in regard to the equipment loss, and the court awarded Karst a judgment against Arch in the amount of $290,370. This appeal and cross appeal followed.

First, Karst contends in a two-pronged argument on direct appeal that the court erred by finding that the clause waiving liability for damages, as set forth in the 1926 deed, operates to absolve Arch of strict liability for damages caused by its longwall mining activities and by its removal of the subjacent support beneath the Karst property. Karst argues that Section 19(2) of the Kentucky Constitution, as ratified by the voters

in 1988, applies to the 1926 deed so as to limit application of its damages liability waiver clause to mining activities conducted by the room and pillar method of mining, which was the method commonly in use for underground mining purposes in 1926. Alternatively, Karst argues that the court erred by failing to find that the damages liability waiver clause was not intended to include damages caused by modern longwall mining techniques. We disagree with both prongs of this argument for the reasons stated hereafter.

In *Buchanan v. Watson*, Ky., 290 S.W.2d 40 (1956), *overruled, Akers v. Baldwin*, 736 S.W.2d 294 (1987), and *Ward v. Harding*, 860 S.W.2d 280 (1993), the court reaffirmed earlier rulings by holding that coal underlying a tract of land may be removed by a mineral owner by means of a strip mining method which results in the destruction of the surface owned by another, and the mineral owner is not liable to the surface owner for damages for the destroyed surface rights unless the right to mine the coal was exercised arbitrarily, wantonly or maliciously. The *Buchanan* rule continued to be the law of Kentucky until *Akers v. Baldwin*, Ky., 736 S.W.2d 294 (1987), wherein *Buchanan* was overruled to the extent that it deprived surface owners of the right to recover damages for the destruction of surface rights as a result of strip mining. Moreover, *Akers* also declared that KRS 381.940, which was passed in response to *Buchanan* and which in effect prevented all strip mining under broad form deeds, was unconstitutional. The Supreme Court found that the statute both violated the separation of powers principle, and impermissibly impaired the obligations of existing contracts, i.e., broad form deeds. However, the Supreme Court reaffirmed *Buchanan* insofar as it upheld a mineral owner's right to extract minerals by strip mining, and the court declined to consider whether the statute either deprived mineral owners of due process, and/or effected a taking of property without the payment of just compensation.

Undaunted, and in response to the *Akers* declaration that KRS 381.940 was unconstitutional, the legislature proposed the adoption of Section 19(2) as a constitutional amendment to the Kentucky Bill of Rights. This amendment, which was ratified by the voters during the November 1988 general election and which is essentially identical to KRS 381.940, states as follows:

> In any instrument heretofore or hereafter executed purporting to sever the surface and mineral estates or to grant a mineral estate or to grant a right to extract minerals, which fails to state or describe in express and specific terms the method of coal extraction to be employed, or where said instrument contains language subordinating the surface estate to the mineral estate, it shall be held, in the absence of clear and convincing evidence to the contrary, that the intention of the parties to the instrument was that the coal be extracted only by the method or methods of commercial coal extraction commonly known to be in use in Kentucky in the area affected at the time the instrument was executed, and that the mineral estate be dominant to the surface estate for the purposes of coal extraction by only the method or methods of commercial coal extraction commonly known to be in use in Kentucky in the area affected at the time the instrument was executed.

As enacted, the amendment requires that in the absence of clear and convincing evidence of the parties' contrary intent, an instrument which subordinates a surface estate to a mineral estate, or which severs or grants a mineral estate or mineral rights but fails to expressly or specifically state or describe the intended method of coal extraction, shall be construed as meaning that the parties intended for the coal to be extracted only by the method(s) of commercial coal extraction commonly known to be in use in that area of Kentucky when the instrument was executed, and as meaning that the mineral estate shall be considered dominant to the surface estate only for purposes of coal extraction by such method(s).

Section 19(2) was held to be constitutional some five years later in *Ward v. Harding*, Ky., 860 S.W.2d 280 (1993), *cert. denied*, 510 U.S. 1177, 114 S.Ct. 1218, 127 L.Ed.2d 564 (1994). Further, the Supreme Court in

*Ward* overruled both *Buchanan* and *Akers,* holding that "broad form" mineral severance deeds would no longer be construed as including the right to strip mine. Hence, the owner of a mineral estate thereafter could not use strip mining methods to extract minerals without the surface owner's consent, unless there was clear and convincing evidence that regardless of when the original severance deed was executed, the parties thereto ·intended to permit recovery of the minerals by such strip mining methods.

Thus, Karst asserts that because the longwall mining techniques utilized by Arch were not in use in Kentucky when the original deed was executed in 1926, Arch was prohibited from engaging in longwall mining beneath the Karst property without Karst's consent. The trial court rejected this argument, concluding that although KRS 381.935 defines "method" or "methods" of mining for purposes of KRS 381.940, and although KRS 381.940 was subsequently declared unconstitutional in *Akers,* the KRS 381.935 definition was still in full force and effect when Section 19(2) was ratified. The court concluded that modern longwall mining is not a separate method of "underground, surface, auger or open pit mining" for purposes of KRS 381.935, and that it therefore is not an excluded "method" of mining for purposes of Section 19(2).

■ Karst argues that the court erred by finding that modern longwall underground mining is not a separate "method" of mining for purposes of Section 19(2) of the constitution. Karst further urges that since KRS 381.935 defines "method" for the exclusive purposes of KRS 381.940, it must be presumed that KRS 381.935 was necessarily invalidated by the finding that KRS 381.940 was unconstitutional. Alternatively, Karst asserts that the court in any event erred by construing the 1926 deed's damages liability waiver clause as being intended to exclude liability for damages caused by modern longwall mining techniques. We disagree with both prongs of Karst's argument.

As noted by Arch, the Supreme Court specifically indicated in *Akers* that it was declaring KRS 381.940 unconstitutional, but not the remaining statutes dealing with the same subject matter. *See* KRS 381.930, KRS 381.935, and KRS 381.945. Moreover, the·court subsequently noted in *Ward* that *Akers* had declared only a "portion" of KRS 381.940 to be unconstitutional. We therefore conclude that there is no merit to Karst's contention that KRS 381.935 is unconstitu·tional and without force or effect.

More important, it is clear that the legislature in effect responded to *Akers* by enabling the voters to revive KRS 381.940 by enacting it as a constitutional amendment. Because the legislature did not simultaneously attempt to repeal KRS 381.930, KRS 381.935, or KRS 381.945, we are of the opinion that there is no significance in the fact that the KRS 381.935 definitional language was not included in Section 19(2). Obviously, the legislature could not reasonably have intended for Section 19(2) to be construed and applied more broadly than the unconstitutional statute which it was intended to replace. Instead, it is only reasonable to conclude that the legislature intended for KRS 381.930, KRS 381.935, and KRS 381.945, together with Section 19(2), to collectively address a mineral estate owner's ability, under a broad form severance deed, to recover coal by strip mining techniques.

Contrary to Karst's argument, it cannot fairly be said that the legislature intended for Section 19(2) to prohibit not only the use of strip mining techniques to extract coal conveyed by most broad form deeds, but also to prohibit the use of modern techniques of underground mining such as longwall mining, especially since KRS 381.935 expressly states that the legislature did not intend to adversely affect the use of modern equipment or machinery with respect to the authorized mining methods set forth in KRS 381.940. Indeed, to conclude otherwise would require us to ignore the entire chain of events which led to the adoption of Section 19(2), as well as to ignore the preamble to the Senate bill proposing the ratification of Section 19(2), which lists purposes identical to those set out in KRS 381.930 concerning the adoption of KRS 381.935 to KRS 381.945, including:

> [T]o facilitate and require the demonstration of a clear understanding between the owners of surface and mineral estates in

land concerning their respective rights to use and occupy or injure the surface of the land; and

. . . .

[to] prevent hardship and injustice to surface or mineral owners arising from uncertainty of the law[.]

 Thus, despite clear legislative intent to the contrary, the outcome sought by Karst would require us to sanction the elimination of a mineral owner's right to recover and extract its coal in an economically feasible manner through the use of modern underground mining techniques. Indeed, depending upon when a mineral deed was executed, in some instances a mineral owner theoretically could be limited to recovering coal by utilizing a pick and shovel, because that was the only technique of underground mining commonly in use in the area when the deed was executed. This we decline to do, as we are unwilling to believe that either the voters or the legislature intended for Section 19(2) to be applied in a manner which could adversely affect and undermine the coal mining industry in Kentucky. Rather, we hold that Section 19(2) was intended and should be applied herein only to prohibit strip mining operations conducted pursuant to broad form deeds in the absence of the surface owner's consent.

 Moreover, as noted above, we disagree with Karst's alternative argument that the court erred by construing the 1926 deed's damages liability waiver clause as being intended to exclude liability for any damages caused by modern longwall mining techniques. In *Ward, supra,* the court reiterated the need to read the words of a deed in the sense in which they were understood, both commonly and by the parties to the deed when it was executed. Here, the deed clearly and unambiguously conferred to Arch's predecessor in title the right to remove all reserved coal from the Harlan seam without leaving any support for the overlying strata or incurring any liability for resulting injuries or damages. Further, it is undisputed that Karst's predecessors were advised before the deed was executed that Arch's predecessor reserved complete mining rights which allowed the removal of all supports for the surface. Thus, it is clear that the parties to the deed agreed that at some point the coal reserved by Arch's predecessor in the Harlan seam might be mined, and that any such mining likely would be by full seam extraction techniques which would leave no support for the coal or surface strata above the mined seam. Additionally, the proof shows that Karst's predecessor was willing to accept such terms because it believed that its overlying coal seam would be mined out before the Harlan seam was mined.

It follows, therefore, that the trial court correctly concluded that the deed's damages liability waiver clause, as used and understood by the parties, was specifically intended by the parties to allow Arch's predecessor to remove all the reserved coal without leaving any support for the coal and property located above. Given this clear intent and agreement, we fail to perceive that the court erred by finding that the deed's damages liability waiver clause applied not only to room and pillar mining techniques, but also to the use of modern longwall mining techniques which were unknown in 1926. Our conclusion in this vein is consistent with relevant authorities from other states. *See, e.g., Wells v. American Electric Power Co.,* 48 Ohio App.3d 95, 548 N.E.2d 995 (1988). Finally, we disagree with Karst's assertion that a different conclusion is compelled by the fact that longwall mining techniques are much more productive than the techniques commonly in use in 1926, as nothing in the deed's language purports to limit productivity in any way.

Next, Karst contends that the court erred by applying the 1926 deed's damages liability waiver clause to Arch's longwall mining activities, as present public policies favor the payment of compensation for damages caused by modern mining methods. We disagree.

 In *Elk Horn Coal Corp. v. Johnson,* Ky., 249 S.W.2d 745 (1952), our court recognized that a surface owner may waive, by either express or implied covenant, the right to recover damages from a mineral owner for the latter's failure to support the surface. Here, as noted earlier, Karst's predecessor waived all liability for damages stemming

from the mining activities of Arch's predecessor, as evidenced by the 1926 deed's clear and unambiguous provision that the reserved right to remove coal could be exercised without leaving any support for the overlying strata, and without liability for injuries or damages which might result from the breaking of the strata. Hence, pursuant to *Elk Horn*, Arch cannot be adjudged liable to Karst for damages unless Arch exercised its right to remove the reserved coal in an arbitrary, wanton, malicious, or grossly negligent manner.

Karst, however, cites *Wiser Oil Co. v. Conley*, Ky., 346 S.W.2d 718 (1960), *Akers, supra*, and *Ward, supra*, in arguing that the principles set out in *Elk Horn* must be limited in application to situations which involve methods of mining contemplated by the parties to the 1926 deed. Since the modern longwall mining techniques utilized by Arch would therefore be excluded, Karst urges that Arch should not claim any benefit from the deed's damages liability waiver clause. We cannot agree.

The cases cited in support of Karst's position are distinguishable on their facts. Culminating in *Ward, supra*, the court adopted the view that the typical broad form deed's mere conveyance of the right to do any and all things necessary and convenient to extract minerals could not be interpreted as a conveyance of the right to damage the surface.

Here, by contrast, we are concerned with an express waiver of liability, coupled with the parties' clear intention and acknowledgement that the reserved coal could be mined without regard to the consequences to the overlying strata. Moreover, the situation now before us involves an arm's length contract between sophisticated business persons regarding a knowing and voluntary waiver of liability for damages to overlying strata caused by authorized underground mining techniques which, even in 1926, created a risk of subsidence. Clearly, significant differences exist between such a situation and one in which a broad form deed, prepared and presented to a landowner by a sophisticated purchaser of minerals, included a "necessary and convenient" clause under which

the mineral owner subsequently claimed a right to strip mine, even though such a method of mining was essentially unknown when the deed was executed and even though it cannot fairly be said that the surface owner contemplated or expected that the property's surface subsequently would be destroyed. Contrary to Karst's contention, we conclude that in the particular factual circumstances presented here, no public policy was adopted subsequent to *Elk Horn, supra*, to address and/or invalidate the damages liability waiver clause included in the 1926 deed, and that the court did not err by finding that the clause is valid and enforceable. This conclusion is especially appropriate herein, as Arch demonstrated and Karst conceded that room and pillar techniques of underground mining, which were commonly in use in 1926, could result in incidental subsidence damages stemming from the overlying strata's collapse into the void created by the removal of coal. Hence, the damages which resulted herein were of the type anticipated by the parties to the deed.

■ Next, Karst contends that even if Arch had a right to use longwall techniques to extract coal from the Harlan seam, the court erred by directing a verdict for Arch as to Karst's alternative claim that Arch exercised that right in an arbitrary, wanton, malicious, or grossly negligent manner. Again, we disagree.

Sizeable portions of the parties' briefs are devoted to arguments and debates as to whether each opposing party's statements on appeal are accurate and/or supported by the evidence. No useful purpose would be served by addressing these factual disagreements, as such a discussion would only serve to unduly lengthen this opinion. Rather, we will merely note that we have carefully reviewed the evidence adduced at trial in the light most favorable to Karst. Like the trial court, we are satisfied that reasonable minds could not differ, and that Arch was entitled to a directed verdict regarding the issue of whether it conducted its longwall mining activities in an arbitrary, wanton, malicious, or grossly negligent manner.

Indeed, there was simply no proof adduced to show that Arch did anything out of the

ordinary while conducting its mining operations. Karst clearly was given timely and abundant actual notice of Arch's intent to mine underneath its property, including an initial notice which was provided five years before the longwall mining activities commenced. Moreover, Karst received regular oral updates regarding the location and progress of Arch's mining activities, and the mere fact that Arch's activities advanced more quickly than was originally anticipated is not significant. Further, we are not persuaded either that the testimony regarding Arch's alleged secrecy and/or mining violations was sufficient to create a submissible jury issue as to whether Arch acted in an arbitrary, wanton, malicious, or grossly negligent manner, or that sufficient evidence existed to create a jury issue as to whether there was a viable, economically feasible, alternative mining plan which Arch tortiously refused to follow.

■ Next, Karst contends that the court erred by failing to allow the jury to determine whether Arch's mining activities were sufficiently "oppressive" to be actionable. We cannot agree.

■ In the mining context, the word "oppressive" has been assigned two meanings. First, a mineral owner acts in an oppressive manner if the means selected for recovering minerals are unreasonable under the circumstances. Alternatively, otherwise reasonable means of recovery may be oppressive because they are utilized in unreasonable ways. *Kentland–Elkhorn Coal Co. v. Charles*, Ky., 514 S.W.2d 659 (1974).

Here, it was essentially undisputed below that given the prevailing economic conditions and the existence of certain geological conditions, Arch could not recover the reserved coal without utilizing modern longwall mining techniques. Since the use of such techniques therefore was necessary for the recovery of the coal purchased by Arch, the selection thereof did not amount to oppressive conduct. *Id.* Further, not only was insufficient proof adduced to create a submissible jury issue as to whether Arch conducted its longwall operations in an unreasonable manner, but we are of the opinion that just the opposite is true. Hence, it follows that the court

did not err by refusing to allow the jury to determine whether Arch engaged in "oppressive" conduct.

■ Given our rulings thus far, we need not address Karst's two contentions regarding the proper determination of damages. Similarly, since Karst was not entitled to recover compensatory damages as a matter of law, the court's refusal to instruct the jury on punitive damages was not error. *See Lawrence v. Risen,* Ky.App., 598 S.W.2d 474 (1980).

Finally, on cross appeal Arch contends that the court erred by failing to direct a verdict as to Karst's claim for equipment damage. We agree.

■ As discussed earlier, the 1926 deed included an express damages liability waiver clause which was valid and enforceable. Thus, any liability of Arch for the loss of the Karst mining equipment, like liability for the loss of Karst's overlying coal, had to be based upon the arbitrary, wanton, malicious, or grossly negligent standard set forth in *Elk Horn, supra,* rather than upon the legal standard of common law negligence. *Cf. Bevander Coal Co. v. Matney,* Ky., 320 S.W.2d 301 (1959).

■ Moreover, we are of the opinion that Arch was entitled to a directed verdict as to the equipment claim. The record shows that Arch had no knowledge of the equipment, and that although Karst was kept informed of the longwall's advancement toward the equipment and was given ample opportunity to move the equipment a relatively short distance to a position of safety, it made no effort to do so. Indeed, the evidence shows that Arch informed Karst that the longwall would be shut down for a two-day period, and that two days would have been sufficient time in which to move the equipment, but that Karst still did not take action at that time. Based upon our review of the evidence, we cannot say that reasonable minds could differ as to whether Arch's actions in regard to the equipment were arbitrary, wanton, malicious, or grossly negligent. *See Elk Horn, supra.* It follows, therefore, that

the court erred by failing to direct a verdict in favor of Arch as to the equipment claim.

For the reasons stated, the court's judgment is affirmed on direct appeal, and reversed and remanded on cross appeal with directions to enter an amended judgment consistent with our views.

All concur.